**SARGENT–WELCH SCIENTIFIC COMPANY, Plaintiff-Appellant,**

v.

**VENTRON CORPORATION and Ventron Instruments Corporation, Defendants-Appellees.**

**No. 77–1082.**

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1977.

Decided Dec. 6, 1977.

As Modified on Denial of Rehearing Jan. 31, 1978.

See, also, 7 Cir., 570 F.2d 347.

D. Jeffrey Baddeley, Skokie, Ill., George R. Kucik, Washington, D. C., for plaintiff-appellant.

Earl E. Pollock, Chicago, Ill., for defendants-appellees.

Before SWYGERT, SPRECHER and TONE, Circuit Judges.

TONE, Circuit Judge.

This is an action under the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 3 of the Clayton Act, 15 U.S.C. § 14, for wrongful cancellation of a dealership. After a bench trial on the issue of liability, the District Court found in favor of the defendants. We affirm in part and vacate and remand in part.

The gravamen of the complaint, as amended, is, in the words of plaintiff's brief,

> that defendants (through their Cahn division) unlawfully terminated plaintiff's "electromagnetic microbalance" dealership in furtherance of Cahn's resale price fixing and tie-in arrangements, and as part of a dealer reduction plan which was intended to diminish the competition faced by Cahn and its favored dealers so as to maintain or improve Cahn's dominance in the market for electromagnetic microbalances and to enhance Cahn's position in the market for a new line of products called "millibalances."

Cahn Instruments Company was formed in 1956 to develop and manufacture a device for precision weighing, the electromagnetic microbalance.[1] The company succeeded in making and selling a line of balances that could be used to weigh small samples to one microgram precision or even a frac-

---

1. In a pre-trial stipulation, the parties described the electromagnetic weighing principle as one whereby a sample of unknown weight is balanced by the force produced by an electric current in a coil in a magnetic field. The weight of the unknown sample is determined by measuring the amount of electrical energy used in balancing the sample, and calibrating this measurement against known weight standards.

tion thereof.[2] In 1967 the company was acquired by Ventron Corporation, which operates Cahn as an unincorporated division.[3] In 1969 Cahn introduced a line of less expensive balances called "millibalances," which also operated eletromagnetically but were less sensitive than the microbalances and therefore were used in different applications.[4]

In 1971 Cahn sold a total of 500 balances in the United States for a total of $608,400. Its total sales in that year were $1,400,000.

From the beginning, Cahn balances were marketed through dealers who also sold a variety of other scientific and laboratory equipment. One of them was E. H. Sargent Company, which became a dealer in 1963 and continued as such after it merged with Welch Scientific Company in 1968 until it was terminated by Cahn in April 1971. At the time of termination, Sargent-Welch had twelve branches in the United States and Canada and represented approximately 3,000 manufacturers of various types of scientific and laboratory equipment. Its annual sales are approximately $60,000,000. Its annual purchases of Cahn balances at the time of termination were less than $40,-000.

In his letter terminating Sargent-Welch as a dealer, Cahn's Director of Marketing stated that Cahn was undertaking a careful evaluation of its "dealership coverage" for the purpose of "optimizing the number of dealers handling the Cahn product line." He then pointed out that Sargent-Welch's purchases from Cahn had been decreasing each year since 1968 and that first quarter sales indicated that 1971 would also be a disappointing year. He also noted Sargent-Welch's refusal to carry the new millibalance line. As a final reason for Sargent-

Welch's termination, the letter referred to "a definite lack of exposure of Cahn products in Sargent-Welch advertising and in your booths at trade shows." In the next year Cahn gave similar explanations in terminating two other dealers.

Cahn's dealer reduction program for "optimizing the number" of its dealers was adopted primarily, the District Court found, "to consolidate sales among its [Cahn's] more effective dealers." The court also found that the Sargent-Welch termination was based on this plan as well as on that company's "sharp decline in . . . performance on behalf of Cahn" and the absence of any prospect of improvement of that performance. Further, the court found,

> Cahn's termination of Sargent-Welch was not anticompetitive in either purpose or effect. Plaintiff's distributorship contract was terminated because of its poor performance. Neither an attempt at tying sales nor an attempt to enforce illegal resale price maintenance, nor a plan to monopolize, attempt to monopolize or eliminate competition was proved to be a factor in the termination.

Elsewhere in his findings, however, the judge said that "[p]laintiff's refusal to handle the millibalances may have been one reason why defendant terminated plaintiff's dealership . . .."

Findings bearing specifically on the theory of a tie-in or full line forcing between microbalances and millibalances were that Sargent-Welch had "failed to prove that defendant attempted to coerce plaintiff into handling [its] new products by, for example, threatening termination"; that Cahn "did not require its dealers to handle the milliba-

---

**2.** A microgram is one-one millionth of a gram (0.000001 or $10^{-6}$ grams); a gram is equal to 0.035 ounces.

**3.** Until 1974 Cahn operated as a division of Ventron's wholly-owned subsidiary Ventron Instruments Corporation, which accounts for the latter being named as an additional defendant in this case. In that year Ventron liquidated Ventron Instruments and has since held Cahn's assets directly. Both defendants, including the

Cahn Division, are collectively referred to in this opinion as "Cahn" or "defendant."

**4.** The original millibalances, introduced in 1969, had ranges that varied with the size of the sample: they could weigh 1 gram to a 1 milligram (one-one-thousandth of a gram) precision, a 100 milligram sample to 100 micrograms, and 10 milligrams to 10 micrograms. The last and most sensitive range was later deleted from the balances' specifications.

lance models as a condition to continuing to be a dealer"; and that Sargent-Welch had not proved that "Cahn refused to sell its microbalances to a dealer who would not handle the millibalances."

All Cahn dealership agreements contained fair trade clauses requiring dealers to adhere to fixed resale prices in fair trade jurisdictions. Sargent-Welch alleged that it had been terminated because of its price-cutting activities and also because the dealer reduction program was designed to eliminate price-cutting among Cahn dealers in general.

Approximately one month before Sargent-Welch was terminated, its branch in Anaheim, California, submitted a bid to the University of California offering Cahn balances at 6 percent below the list price. California at that time was a fair trade state. Cahn's Director of Marketing wrote a letter to the Sargent-Welch home office describing the University of California bid as "an obvious price cut and a clear violation of our Fair Trade Agreement" and asking for an explanation "[b]efore we take any action." Sargent-Welch replied by disclaiming knowledge of the situation and referring Cahn to the branch manager.

The District Court found that, because Cahn sold balances directly to end-users in California in competition with its dealers, it could not claim the protection of the fair-trade exemptions from Sherman Act coverage, the Miller-Tydings Amendment[5] and McGuire Act,[6] which were in effect at that time.[7] Cahn's fair trade program in California was therefore held to be horizontal price-fixing in violation of § 1 of the Sherman Act. The court continued,

> However, since defendant did not terminate plaintiff for price-cutting, the point is unavailing. Furthermore, plaintiff has failed to prove that defendant's price maintenance agreements caused a loss of sales or profits or other injury to its business in any state where the agreements were invalid.

The District Court made the following additional findings with respect to the price-cutting charges:

> Cahn carried out its fair trade program in good faith and, to the best of its knowledge, in accordance with the requirements of the applicable statutes. Cahn dealers from time to time communicated to Cahn their concern about fair trade violations. But Cahn never agreed with any of its dealers to fix or control prices, except where authorized by applicable fair trade laws, and all Cahn dealers, including plaintiff, knew and understood that the minimum selling prices established by Cahn need only be adhered to in those states and as to those sales where fair trade was applicable. All Cahn dealers, including plaintiff, in fact sold Cahn balance products at less than the minimum retail selling prices established by Cahn on certain occasions, usually when necessary to meet competition.

In ruling on the monopolization charge, the court found that the relevant market was not microbalances, as Sargent-Welch contended, but all "precision balance[s]," i. e., balances weighing only to $\frac{1}{100,000}$ of a gram (see note 4, *supra*), and that, because Cahn possessed only an 8 percent share of that market, it did not have a monopoly. The court also found,

> [E]ven assuming that Cahn had monopoly power, plaintiff . . . failed to show that Cahn grew as a consequence of anything other than superior products, business acumen or historic accident, or that Cahn used such power in furtherance of the alleged monopoly.

### I. *Price-Fixing*

Sargent-Welch's price-fixing theory is predicated on the contention that Cahn sold balances in competition with its dealers, thereby forfeiting the benefit of the exemp-

---

5. Act of August 17, 1937, 50 Stat. 693 (formerly a part of 15 U.S.C. § 1).

6. Act of July 14, 1952, 66 Stat. 632 (formerly in 15 U.S.C. § 45(a)).

7. Both were repealed by the Act of December 12, 1975, 89 Stat. 801.

tion of fair trade laws from antitrust prohibitions. In *United States v. McKesson and Robbins, Inc.,* 351 U.S. 305, 310–311, 76 S.Ct. 937, 100 L.Ed. 1209 (1956), the Supreme Court held that enforcement of a fair trade program under these circumstances was illegal *per se.*

■ Cahn did not solicit direct sales of products sold through dealers or hold itself out as a dealer in these products. Customers who asked Cahn for assistance in selecting a balance were referred to a dealer. Cahn did fill unsolicited orders for these products, paying a commission to a dealer who had influenced the sale. Because of a number of such direct sales in California, the District Court held that Cahn's fair trade program was illegal in that state.[8] The court declined, however, as we have observed, to hold the company's nationwide fair trade program illegal. Although the court failed to articulate a basis for this distinction, defendant points out that Sargent-Welch failed to prove the volume of direct sales in other states or even to point out which states recognized fair trade at that time. Sargent-Welch argues that the Cahn invoices of direct sales to end-users, which were introduced along with approximately 1600 other trial exhibits, were sufficient proof of the illegality of Cahn's entire fair trade program. But dumping into the record evidence of such dubious intelligibility, without a showing of which sales, if any, were made in competition with dealers, *cf. Snap-On Tools Corp. v. FTC,* 321 F.2d 825, 833–835 (7th · Cir. 1963), and apparently without tabulation, analysis, or explanatory

testimony, was hardly sufficient to require the court to decide the issue in favor of plaintiff, especially in the absence of active solicitation of business in competition with the dealers. Moreover, as the District Court found, Sargent-Welch failed to prove that it suffered injury from Cahn's resale price maintenance. *Cf. Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 694 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.d.2d 349 (1976).

■ Sargent-Welch also argues that Cahn attempted to enforce an illegal resale price maintenance program in non-fair trade states. The evidence was that Cahn maintained a policy of taking action against price-cutting only in fair trade jurisdictions. The District Court found that Cahn suggested resale prices and exhorted its dealers to adhere to them but took no further action in non-fair trade states, and held that this conduct did not violate the law. We cannot say that this was error.

■ We have examined the conflicting evidence on the other price-fixing issues, *viz.,* whether price-cutting by Sargent-Welch was a reason for its termination and whether Cahn's dealer reduction program was administered in furtherance of an illegal price-fixing scheme. With respect to these issues, the District Court found that Cahn did not terminate Sargent-Welch for price-cutting, and that

> Cahn never agreed with any of its dealers to fix or control prices, except where authorized by applicable fair trade laws, and all Cahn dealers, including plaintiff,

---

**8.** The court's findings with respect to Cahn's competition with its dealers are somewhat ambiguous. In paragraph 40 of its findings, the court described the Cahn policy on unsolicited orders; in paragraph 41 it noted Cahn's direct sales of two types of specialized balances that were never sold through dealers; and in paragraph 42 it noted Cahn's sales to original equipment manufacturers who incorporated modified Cahn balances into other equipment, which was then resold. The court made no finding—and we can see no evidence in the record—that the non-dealer items referred to in paragraph 41 were competitive in some other way with dealer items or that dealers also sold to OEM accounts. Ordinarily, there is no fair

trade violation unless this type of competition exists, see *Snap-On Tools Corp. v. FTC,* 321 F.2d 825, 833–835 (7th Cir. 1963); *Esso Standard Oil Co. v. Secatore's, Inc.,* 246 F.2d 17, 20 (1st Cir.), *cert. denied,* 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); *Upjohn Co. v. Charles Labs, Inc.,* 277 F.Supp. 445, 450 (S.D.N.Y. 1967). Nevertheless, the court held that "[t]he activities described in part in pars. 40, 41 and 42 rendered defendant's fair trade agreement with plaintiff unenforceable in California . . . ." While this holding appears to be open to challenge, defendants do not press an argument on the point, and our disposition of the case makes it unnecessary to decide it.

knew and understood that the minimum selling prices established by Cahn need only be adhered to in those states and as to those sales where fair trade was applicable.

These findings are not clearly erroneous. Our detailed review of the evidence supporting them, being of no value as precedent, appears in an unpublished order filed with this opinion.

## II. *Tie-in and Monopolization*

[4] Because Cahn's strength in the market is relevant to both the issues of tie-in, or full-line forcing,[9] and monopolization, it is convenient to treat these issues together. Sargent-Welch's misuse-of-power argument includes the theory that Cahn used its market power to accomplish resale price maintenance. We dispose of this theory and the tie-in-by-agreement theory first, because we can do so without determining Cahn's market position. We then turn to the remaining monopolization question, which relates to full-line forcing.

### A. *Misuse of Power for Resale Price Maintenance Program*

Sargent-Welch argues that a purpose of Cahn's dealer reduction program was to eliminate price competition among the remaining dealers and promote their adherence to resale prices established by Cahn, in violation of §§ 1 and 2 of the Sherman Act.[10] We think that the facts found by the District Court based upon the resale price maintenance evidence, in findings we have sustained as not clearly erroneous, are inconsistent with the existence of such a purpose. We therefore do not disturb the judgment on this ground.

### B. *Tie-in by Agreement*

Sargent-Welch does not contend that there was a tie-in arrangement between itself and Cahn but that Cahn's "scheme of getting tie-ins" violated the law.[11] To establish a tying arrangement violative of § 1 of the Sherman Act or of § 3 of the Clayton Act the plaintiff must first prove an agreement or understanding between the seller and the buyer conditioning the seller's sale of one product upon the buyer's purchase of another. See *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958):

> [A] tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.

See also *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1223–1224 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *McElhenney v. Western Auto Supply Corp.,* 269 F.2d 332, 338–339 (4th Cir. 1959). Coercion has been viewed as an essential element.[12] *Times-Picayune*

---

**9.** Requisite elements of a § 1 violation are the presence of market power sufficient to enable the seller "to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market," *United States v. Fortner Enterprises, Inc.,* 429 U.S. 610, 620, 97 S.Ct. 861, 867–868, 51 L.Ed.2d 80 (1977) (*Fortner II*); and sales of the tied product resulting from the tie-in that are not insubstantial, *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 502, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (*Fortner I*). While the presence of either is enough under § 3 of the Clayton Act, § 1 of the Sherman Act requires both. See *Moore v. Jas. H. Mathews & Co.,* 550 F.2d 1207, 1214 (9th Cir. 1977).

**10.** As we point out in part II, C, *infra,* the use of monopoly power, even though lawfully acquired, for an unlawful purpose is a violation of § 2 of the Sherman Act. If the misuse results in an agreement or understanding, § 1 of that Act is also violated.

**11.** Counsel for Sargent-Welch so stated in oral argument, adding that "this was a § 1 violation." We shall assume that counsel intended to rely on § 3 also, since his brief argues that § 3 was violated.

**12.** The existence in a sales agreement of a condition which is initially desired by both buyer and seller should be sufficient. *Cf., e. g., Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), in which no significance was attached to the absence of coercion in the formation of the agreement.

*Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed.2d 1277 (1953); *Ungar v. Dunkin' Donuts of America, Inc., supra,* 531 F.2d at 1224; *Response of Carolina, Inc. v. Leasco Response, Inc.,* 537 F.2d 1307 (5th Cir. 1976). Of course, the agreement or understanding need not be express but may be inferred from the circumstances. *Ungar v. Dunkin' Donuts of America, Inc., supra,* 531 F.2d at 1224. It is for the trier of fact to draw the inferences, however, and the district judge in the case before us found not only that Sargent-Welch "failed to prove that defendant attempted to coerce plaintiff into handling [its] new products by, for example, threatening termination," or that Cahn "refused to sell its microbalances to a dealer who would not handle the millibalance," but also that Cahn "did not require its dealers to handle the millibalance models as a condition to continuing to be a dealer." There was evidence to support these findings, including testimony of the Chairman of the Board, the President, and the Technical Director of Sargent-Welch that Cahn had made no threats to them and they knew of no threats to their company, and testimony of another terminated Cahn dealer called as a witness by Sargent-Welch that Cahn did not condition sales of its microbalances upon an agreement to purchase millibalances. Because the essential element of agreement or understanding is missing, Sargent-Welch has failed to establish a violation of § 1 of the Sherman Act or § 3 of the Clayton Act.

C. *Monopolization*

▮▮▮ The findings just referred to do not dispose of the contention that Cahn violated § 2 of the Sherman Act by unilaterally using monopoly power in microbalances to force unwanted millibalances on its dealers;[13] for that section, unlike § 1, proscribes unilateral conduct. Section 2 is

violated upon a showing of the existence of monopoly power, whether lawfully or unlawfully acquired,[14] and the general intent to abuse that power. *United States v. Griffith,* 334 U.S. 100, 105–107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). A private plaintiff relying on § 2, however, must demonstrate that he has been "injured in his business or property" by the defendant's conduct in order to obtain relief. Clayton Act § 4, 15 U.S.C. § 15. Thus we must determine not only whether monopoly power existed but, if so, whether there was evidence tending to show that Sargent-Welch suffered injury by reason of a misuse of that power by Cahn in the manner alleged. *Cf. United States v. Griffith, supra,* 334 U.S. at 107, 68 S.Ct. 941. We hold that, contrary to the District Court's holding, Cahn did have monopoly power, and that a remand is therefore necessary for findings on issues that court did not reach.

1. *The Relevant Market*

If electromagnetic microbalances constitute a relevant submarket for antitrust purposes, Cahn had a monopoly in that submarket, for despite its 8.2 percent share of the sales of all precision balances it accounted for over 90 percent of the sales of electromagnetic microbalances. The District Court, however, rejected Sargent-Welch's submarket contention, finding,

> The Cahn ELECTROBALANCE line has competed with a wide variety of products, including many balances with different designs and specifications which are not referred [to] as "microbalances" or "millibalances", and many products that are not balances.

We hold this finding clearly erroneous. *Cf. Telex Corp. v. International Business Machines Corp.,* 510 F.2d 894, 915 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

---

**13.** The theory that the termination was pursuant to a plan to use monopoly power over microbalances to monopolize the entire field of precision-weighing devices was disposed of by the District Court's finding that intent to monopolize the larger market was not proved. That theory is not urged in this court.

**14.** The District Court found that Cahn's market position was lawfully acquired. Sargent-Welch does not seriously challenge that finding, and we do not disturb it.

In determining what constitutes a relevant market for antitrust purposes, the goal is to "delineate markets which conform to areas of effective competition and to the realities of competitive practice." *L. G. Balfour Co. v. FTC*, 442 F.2d 1, 11 (7th Cir. 1971). The "area of effective competition" may be a small submarket supplying specialized products or services. See *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 307–309 (7th Cir. 1976); *Cass Student Advertising, Inc. v. National Educational Advertising Services, Inc.*, 516 F.2d 1092, 1095 (7th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). See also *United States v. Connecticut National Bank*, 418 U.S. 656, 664, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974). In delineating a relevant submarket, we are to look at

> such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962).

The most important of these factors is uniqueness of the product's functions and therefore its uses. If two products are "reasonably interchangeable by consumers for the same purposes," they are considered to be in the same market. *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956); *United States v. Continental Can Co.*, 378 U.S. 441, 447–456, 84

S.Ct. 1738, 12 L.Ed.2d 953 (1964). See *Bendix Corp. v. Balax, Inc.*, 471 F.2d 149, 161 (7th Cir. 1972), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973). We have said on two relatively recent occasions, however, that a market definition "which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful." *Cass Student Advertising, Inc. v. National Educational Advertising Service, Inc., supra*, 516 F.2d at 1095, quoting from *L. G. Balfour Co. v. FTC, supra*, 442 F.2d at 11, which in turn quotes from *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 592 (S.D.N.Y.1958).

Electromagnetic microbalances are use in a number of diverse and scientifically complex applications. Most would not be feasible without an electromagnetic microbalance.[15] Others could be performed, though less efficiently, with a less sensitive balance, or by the use of non-gravimetric techniques employing other types of laboratory equipment.[16] The extent of competition with microbalances in the latter type of application is far from clear. Testimony as to non-gravimetric techniques was largely hypothetical, and testimony as to balance sales lost to other manufacturers often failed to describe the characteristics of the competing balance or the frequency with which it was encountered. Yet the unmistakable imprint of the evidence is that competition was not significant. By and large, microbalances were purchased by technically sophisticated customers who needed them for microweighing applications. A customer would ordinarily not buy a microbalance if he intended to use it for tasks a much less expensive, coarser balance could perform.[17]

---

**15.** A former president of Cahn testified that 80 percent of the weighings for which microbalances are used would have been impossible or impracticable before those instruments were developed. Defendant has not called our attention to any contrary evidence and we have found none.

**16.** For example, for magnetic susceptibility analysis, it would be possible to use one technique employing a conventional balance, another using a Cahn microbalance and still another using a nuclear magnetic resonator, a very expensive device.

**17.** The District Court found that there was a functional overlap between Cahn microbalances and coarser balances, presumably because a Cahn balance could also be used to perform less precise weighings. But the evidence indicates that, in practice, such under-utilization of a Cahn balance would be unusual; apart from being more expensive, the Cahn balances are unable to weigh large samples (capacities vary from one gram to 100 grams) and are more difficult to operate than a standard analytical balance. The exception would be the unusual situation in which another quality of the Cahn

Microweighing is beyond the maximum sensitivity of most conventionally designed balances. Originally, balances designed to weigh into the microgram range had to be used in an artificial environment on a foundation isolated from vibration, shielded even from the heat of the operator's body. The sample, in transit to and from the weighing device, could change weight sufficiently to upset the results. Microbalances, on the other hand, are relatively impervious to vibration and temperature changes, are portable, and do not have to be set up on a level plane. They can also be used in a vacuum and can be used with a recorder to measure weight changes over time—two more capabilities possessed by hardly any mechanical balances. The evidence showed that, because of these differences, mechanical balances were used only where microbalances could not be, as, for example, when the sample weight exceeded the capacity of a microbalance.[18] Thus an end-user who had certain applications had little choice but to purchase a microbalance.

██ Examination of other factors outlined in *Brown Shoe* supports the conclusion that microbalances constitute a submarket. First, the evidence shows that Cahn viewed microbalances as a distinct market and itself as the market leader: in 1969 the president of Ventron gave a speech in which he stated, "We are virtually alone in this market. Our products are patented. They are the recognized standard Microbalances for research use . . . ." Other documents indicate that Cahn retained this perspective throughout 1971, considering itself unaffected by competition from manufacturers of coarser balances or even mechanical balances weighing in the range of its microbalances, except with respect to the millibalances, which were viewed as a "small incursion" into the larger balance market. A marketing analysis done for Cahn in 1969 came to the same conclusion.

Second, while Cahn shared a majority of its customers with other balance manufacturers, it did not sell to the whole spectrum of balance customers. Thus, when Cahn introduced the millibalances, it saw itself appealing to a new end-user market. Later, when the millibalances developed a number of repair problems, Cahn attributed some of the difficulties to the lower level of technical sophistication possessed by its customers in the new market. Finally, Cahn's pricing structure was apparently unrelated to that of coarser balances. Moreover, because of Cahn's preeminence in the microweighing field, the demand for its microbalances was relatively insensitive to price changes. This was not true with respect to the millibalances, which, as we have said, were in competition with the coarser balances. We conclude that Cahn held a monopoly in the electromagnetic microbalance submarket.

### 2. Misuse of Power Over Microbalances to Gain Sales of Millibalances

Finding that Cahn holds a lawfully acquired monopoly [19] in the microbalance submarket is only the first step in resolving the § 2 issue. It must also be determined whether there was a misuse of the monopoly power resulting in injury to the plaintiff's business or property.[20]

██ A specific intent to monopolize need not be shown to establish the offense of monopolization when the monopolist undertakes anticompetitive actions, *United States v. Griffith, supra,* 334 U.S. at 105, 108, 68 S.Ct. 941; 1 J. von Kalinowski, *Antitrust Laws and Trade Regulation* § 8.02[4], p. 8–43 (1977 rev.) (hereinafter von Kalinowski). There are kinds of acts which would be lawful in the absence of monopoly but, because of their tendency to foreclose competitors from access to markets or customers or some other inherently

---

balance, such as its relative ability to withstand vibration, was needed.

**18.** The evidence showed that Mettler's M–5 micro or semi-microbalance was used primarily for the weighing of Pregl absorption tubes, a

function which Cahn balances could not efficiently perform.

**19.** See note 14, *supra.*

**20.** See text following note 14, *supra.*

anticompetitive tendency, are unlawful under § 2 if done by a monopolist, e. g., the leasing practices in *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 343 (D.Mass.1953), aff'd *per curiam*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954); see also 1 von Kalinowski § 8.02[4][b], p. 8–55. The anticompetitive quality of an act may depend, however, upon the purpose with which it was done. *E. g., Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 375, 47 S.Ct. 400, 71 L.Ed. 684 (1927). The termination in this case is, we believe, such an act. Its lawfulness depends upon Cahn's purpose, which includes the purpose of the dealer reduction program pursuant to which the District Court found the termination was carried out.

Cahn offered evidence tending to prove that, because its balances were sophisticated instruments, a dealer's salesman needed training to sell them effectively. When Cahn's $600,000 in United States sales was divided among too many dealers, each dealer's share of those sales was insufficient to provide an incentive for that needed training. Moreover, Cahn itself had only three salesmen, so its ability to train and assist dealer salesmen was limited. Reducing the number of dealers, according to Cahn, would ameliorate these difficulties with the result, in the words of Ventron's president, that "Cahn would get more sales per unit of sales effort."

█ Improvement of the efficiency of Cahn's marketing machinery in the manner just described would not be an improper purpose. While the possessor of lawfully acquired monopoly power may not use that power as leverage to deprive competitors of access to customers, to force customers to maintain resale prices, or in any other coercive manner, see *United States v. Griffith, supra*, 334 U.S. at 107–108, 68 S.Ct. 941, he is not forbidden from improving his efficiency in manufacturing or marketing, even though the effect of doing so will be to maintain or improve his sales. Although the line between "superior skill, foresight, and industry" on the one hand, and conscious conduct evidencing "a persistent determination to maintain" a monopoly by "anticipat[ing] and forestall[ing] all competition," *United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2d Cir. 1945), is sometimes difficult to draw, we think the kind of conduct we have described would not be unlawful.[21]

The District Court made no specific findings as to the purpose of the dealer reduction program, although it did find that it was a "program to consolidate [Cahn's] sales among its more effective dealers," and that the "activities complained of in this case were primarily for the legitimate objective of maintaining sales and profits." The judge found that the termination of Sargent-Welch was based on "the sharp decline in plaintiff's performance on behalf of Cahn and the lack of any indication that plaintiff's performance would improve in the future," i. e., "poor performance," and on the dealer reduction program. Further, as we have noted, he found a failure of proof that Cahn refused to sell its microbalances to a dealer who would not handle millibalances; he found too that Cahn did not require its dealers to handle millibalances as a condition to continuing as a dealer. Also, however, he found that Sargent-Welch's "refusal to handle the millibalances may have been one reason why defendant terminated" the dealership.

---

**21.** The 1955 Report of the Attorney General's Committee to Study the Antitrust Laws states:

> The *Alcoa* case is not to be interpreted as penalizing enterprise; instead it declares illegal monopoly maintained by policies intended to discourage, impede or even prevent the rise of new competitors. (Footnote omitted) Att'y Gen.Rep. 60 (1955).

Von Kalinowski expresses the opinion that [c]areful analysis . . . of [the *Alcoa*] holding indicates that monopoly power will be condemned by the courts only when such power is maintained by policies intended to limit or prevent the entry of new competitors, or to exclude present competitors.

> 1 von Kalinowski § 8.02[4], p. 8–62, n. 146. *Cf.* also *United States v. Griffith, supra*, 334 U.S. at 107, 68 S.Ct. 941; *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 927–928 (10th Cir.) *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

These findings, especially because they include the one described last, do not logically exclude the possibility that either (a) a purpose of the dealer reduction program was unilaterally to use Cahn's market position in microbalances to further sales of millibalances to surviving dealers by causing them to fear that unless they handled millibalances they would not be able to buy microbalances, or (b) that, although the dealer reduction program did not have such a purpose, Cahn's action in terminating Sargent-Welch did. In either event, Cahn would have misused monopoly power in violation of § 2. *Cf. United States v. Griffith, supra,* 334 U.S. at 106–107, 86 S.Ct. 941; *Lorain Journal Co. v. United States,* 342 U.S. 143, 153–154, 72 S.Ct. 181, 96 L.Ed. 162 (1951); 1 von Kalinowski, § 8.02[4], p. 8–54.

These possibilities must be the subject of further findings, which the judge who tried the case is in the best position to make.[22] We therefore remand for those findings. Appropriate conclusions of law and a supplemental judgment are to be entered on the remanded § 2 issue.

In its arguments, Cahn places considerable emphasis on the fact that its gross sales of balances are relatively small in amount, $608,400 in the United States and $1,400,000 in total in 1971, while Sargent-Welch is a large scientific supply house, representing over 3,000 vendors and selling annually over $60,000,000, whose purchases of Cahn products had dwindled to a level below $40,000 when it was terminated. The implication is that Sargent-Welch is cynically exploiting the antitrust laws although it has suffered little or no harm from the conduct complained of. It may be anomalous and even ironic that the antitrust laws may afford relief to the giant dealer against the small supplier. Yet we know of no exceptions to those laws based on the relative size or affluence of the parties. If the additional findings of the District Court lead to a determination that § 2 was violated, but Sargent-Welch has suffered little injury as a result of the violation, the damages it will recover will be commensurately small.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

---

**22.** Sargent-Welch argues that an inference not only of purpose to coerce but achievement of that purpose should be drawn from the evidence that millibalances were poor products and yet all the Cahn dealers who survived the dealer reduction program carried millibalances. That conclusion, however, may be negatived by other evidence, such as that indicating that the millibalances were greatly improved after their initial debut, that one model became very successful, and that the discount schedule was improved. Of some relevance is the court's finding that Sargent-Welch declined to handle millibalances "to attempt to pressure Cahn to improve the discounts" on microbalances.