FONTANA AVIATION, INC., Plaintiff,

v.

The CESSNA AIRCRAFT COMPANY
and Cessna Finance Corporation,
Defendants.

No. 77 C 728.

United States District Court,
N. D. Illinois, E. D.

Nov. 21, 1978.

McConnell & Campbell, Chicago, Ill., for
plaintiff.

Kirkland & Ellis, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

FLAUM, District Judge:

This matter comes before the court upon defendants' Preliminary Motion for Summary Judgment. For the reasons set forth below, the Motion is granted in part and denied in part.

By virtue of a written agreement between it and Aviation Activities, Inc., an independent wholesale distributor of Cessna airplanes and equipment, plaintiff, Fontana Aviation, Inc. (Fontana), has been a dealer

in Cessna multi-engine aircraft since 1969. Fontana is in the business of selling new and used general aviation aircraft[1] and installing avionics equipment[2] manufactured by others.

Defendant, The Cessna Aircraft Company (Cessna), is the largest manufacturer in the United States of general aviation aircraft. Through its Aircraft Radio and Control Division (ARCD), Cessna also manufactures and sells avionics equipment. In addition, Cessna owns certain of the distributors of its aircraft and avionics. These distributors are not separately incorporated. Finally, through a wholly owned subsidiary, defendant Cessna Finance Corp. (CFC), Cessna is engaged in the business of providing aircraft financing for distributors, dealers, and purchasers of Cessna aircraft.

In 1959, Cessna obtained the stock, business, and assets of Aircraft Radio Corporation (ARC), an independent manufacturer of avionics. ARC was operated as a wholly owned subsidiary of Cessna until about September 30, 1968, at which time it was dissolved and replaced by ARCD. However, despite the fact that Cessna has been making multi-engine airplanes[3] and avionics for many years, it has always sold both products separately, as well as in the form of fully equipped aircraft.[4]

Plaintiff chose to take advantage of Cessna's policy of marketing unequipped planes and avionics as two distinct products. Fontana bought unequipped Cessna aircraft and, in accordance with its customers' specifications, installed therein avionics made by King, Collins, RCA, Bendix, and others. Because these brands of avionics were, until recently, much less expensive[5] than the comparable models made by ARCD, Fontana was able to sell packaged Cessna airplanes for less money than were its competing Cessna dealers who elected to sell Cessna Aircraft equipped with ARCD avionics. Accordingly, plaintiff was able to run a profitable business.

In 1974, concerned with the competitive disadvantage under which it perceived its avionics division to be operating, Cessna began offering its packaged aircraft at a special package price. Cessna extended this discounting program to packaged multi-engine planes—the type that Fontana retailed as a Cessna dealer—in 1975. At the same time, Cessna increased the manufacturer's recommended dealer cost/list prices of its unequipped aircraft and decreased those of its avionics.[6] Together, these marketing decisions will be referred to as Cessna's Marketing Program (CMP) or "pricing policy."

Due to the nature of this court's ruling on the present Motion, it is not necessary to go into the complex factual background of this case in greater detail. Suffice it to say that, as a result of Cessna's efforts to increase the sales of its avionics, Fontana's business dried up, and it is in the process of liquidation.

In response to these developments, Fontana brought this suit against Cessna and CFC, claiming that defendants put plaintiff out of business by violating the federal

---

1. The class of airplanes consisting of all aircraft other than those made for commercial airlines and the military is categorized as "general aviation aircraft."

2. Avionics includes communication, navigation, and guidance equipment.

3. Henceforth, all references to airplanes or aircraft shall be understood as referring to multi-engine craft only.

4. It appears that there have been two exceptions to this general marketing practice. Specifically, Cessna seems to market its model 441 jet-prop and its Citation jet as packaged craft only. However, the 441 jet-prop was not sold to dealers until after Fontana was in the proc-

ess of liquidation, and the Citation jet is only sold directly by Cessna to consumer/users.

5. Plaintiff also maintains that Cessna's avionics were "less sophisticated and of inferior quality" to those manufactured by its competitors.

6. It is not alleged that the resulting cost/price of ARCD produced avionics is predatory. In fact, according to undisputed figures, although the cost of competitive suppliers' avionics increased as Cessna's products' cost was decreasing, Cessna's avionics remained more expensive than King's and Bendix's, at least in the 1976 model year.

antitrust laws. In Count I of its two count Complaint, Fontana charges defendants with violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14, 18. Count II charges defendants with a second violation of section 1 of the Sherman Act. In each case, plaintiff seeks treble damages and injunctive relief under 15 U.S.C. §§ 15, 26.

Defendants filed the instant Motion in September, 1977. They present three arguments in support of their request for the entry of summary judgment against plaintiff. First, they deny that Fontana can recover damages for any losses occasioned by any antitrust violations that defendants may have committed, citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) and *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Second, they contest Fontana's standing to challenge the alleged tie-in violation of 15 U.S.C. §§ 1, 14. Finally they deny that, with regard to its claim under section 2 of the Sherman Act, plaintiff has alleged a legally cognizable product market.[7]

 Before proceeding to a discussion of the merits of defendants' Motion, it is necessary to address plaintiff's contention that summary judgment should not be granted at this time since discovery is incomplete.

Rule 56, Fed.R.Civ.P., provides that summary judgment may be entered

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Despite any inferences that plaintiff may wish to draw from *Poller v. CBS, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), Rule 56 does apply to antitrust cases. *See, e. g., Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Lamb's Patio Theatre, Inc. v. Universal Film Exchange, Inc.*, 582 F.2d 1068 (7th Cir. 1978).

Under certain circumstances, the Federal Rules allow a party to successfully resist a motion for summary judgment on the basis of incomplete discovery. Rule 56(f), Fed.R. Civ.P., states that a court can refuse to enter summary judgment when

it appear[s] from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition.

But in *Lamb's Patio Theatre, Inc., id.* at 1071, the court quoted with approval the following limiting language from *Willmar Poultry Co. v. Morton-Norwich Products, Inc.*, 520 F.2d 289, 297 (8th Cir. 1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976):

Rule 56(f) is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious. A party invoking its protections must do so in good faith by affirmatively demonstrating why he cannot respond to a movant's affidavits . . . and how postponement of

---

7. In their Preliminary Motion, defendants originally asked for summary judgment on the additional ground that "[CFC's] suspension of financing of avionics not manufactured by Cessna's ARC division does not state a claim for relief under the antitrust laws." Plaintiff responded to this portion of defendants' Motion by saying that it was not alleging that the facts surrounding the financing cutoff constitute a tie-in barred by 15 U.S.C. §§ 1, 14.

With regard to the pleadings in this cause the court notes that while there may be legitimate reasons why, on occasion, a complaint in an antitrust case may have to be broadly drawn, 2 P. Areeda & D. Turner, Antitrust Law § 317 (1978), this matter was not advanced by the failure of the plaintiff in the instant case to segregate or otherwise identify the various claims lodged in Count I, or to distinguish between the "overt acts" and the actions claimed to be themselves illegal in Counts I and II of its Complaint.

The court further notes that while defendants' briefs filed in support of this Motion were generally helpful in considering the issues presently before it, the court would have preferred to have received such pleadings without certain of the more caustic remarks contained therein. (See, e. g., Reply Brief, note at p. 20).

a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.

In this case, plaintiff, by affidavit, avers that it has not begun substantive discovery and that "plaintiff is unable to state what further documentary and testimonial proofs will be adduced in the course of discovery, and which may be further probative of the anti-competitive purpose and effect of the conspiracy alleged." This opaque remark is only slightly illuminated by the suggestion, contained in Fontana's original brief in this Motion, that "the evidence in the present case will come largely from the defendants".

Fontana does not suggest, however, how further discovery from defendants might be of any value to it in rebutting the arguments made by them in the context of this Motion. Given the issues raised by defendants' Motion, this court is unable to conceive of any information presently at the disposal of defendants but not of plaintiff, that might be relevant to the court's disposition thereof. Therefore, the court finds Fontana's objection under Rule 56(f) to the entry of summary judgment against it to be without merit, cf. *Lamb's Patio Theatre, Inc. v. Universal Film Exchange, Inc.*, 582 F.2d 1068 (7th Cir. 1978); *Willmar Poultry Co. v. Morton-Norwich Products, Inc.*, 520 F.2d 289, 294, 297 (8th Cir. 1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976), and so it will now turn to the merits of defendants' Motion.

■ In Count I of its Complaint, Fontana alleges that defendants and their co-conspirators violated section 1 of the Sherman Act and section 3 of the Clayton Act by tying the sale of Cessna-built multi-engine aircraft (the tying product) to the sale of factory-installed ARCD avionics equipment (the tied product).[8] As defendants observed in their Reply Brief, plaintiff concedes that at no relevant time prior to the liquidation of Fontana was any multi-engine airplane made available to it only as a packaged craft. Rather, plaintiff charges that Cessna and its co-conspirators effectively tied the sale of Cessna airplanes to the sale of factory-installed ARCD avionics by offering economic incentives designed to encourage retailers to buy factory-equipped Cessna planes.[9]

The Seventh Circuit Court of Appeals recently held that

[t]o establish a tying arrangement violative of § 1 of the Sherman Act or of § 3 of the Clayton Act the plaintiff must first prove an agreement or understanding between the seller and the buyer conditioning the seller's sale of one product upon the buyer's purchase of another.

---

8. It is not completely clear whether plaintiff means to allege that ARCD avionics equipment is the tied product, or whether the tie-in is claimed to involve the installation of avionics equipment (a broader range of products), the installation of avionics equipment (a tied service), or the installation and sales of (ARCD or general) avionics equipment (a tied product plus a tied service). Fontana seemingly adopts each of these interpretations of its cause of action at different points in its briefs. While it should be noted that section 3 of the Clayton Act is inapplicable to tie-ins involving services, *United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545, 554 (E.D.Pa.1960), *aff'd per curiam*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961); *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55, 61 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970), the court's disposition of the instant Motion does not turn on its precise characterization of the item(s) the purchase of which is said to be tied to the purchase of Cessna multi-engine planes. However, the gravamen of Fontana's charge is that, owing to Cessna's adoption of CMP, Cessna's price scheme is forcing its retailers to buy planes with factory-installed ARCD avionics. Therefore, the installation and sale of ARCD avionics equipment will be referred to as the tied product—although it encompasses a tied service as well—throughout this opinion.

9. Thus, according to the "definitive" summary of its cause of action contained in its Supplemental Memorandum in opposition to the instant Motion, Fontana does not challenge Cessna's marketing policies with regard to its model 441 jet-prop and its Citation jet as illegal tie-ins. The court regards this interpretation of plaintiff's own Complaint, from which Fontana has nowhere deviated, as authoritative.

*Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 708 (7th Cir. 1977), *cert. denied*, —— U.S. ——, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). Plaintiff has alleged no such agreement or understanding and the evidence before the court upon this Motion negates the possibility that one ever existed. Until the time of its liquidation, Fontana was able to purchase, unequipped, every Cessna model airplane that it could buy, in its capacity as a Cessna dealer, as part of a fully equipped package.[10] Therefore, the court holds that, as a matter of law, plaintiff does not allege a legally cognizable tie-in violation of the federal antitrust laws, and that none did, in fact, exist.[11] Accordingly, summary judgment is granted for defendants on the tie-in claims, without consideration of the other arguments advanced by defendants relating to those claims.[12]

■ Defendants assert that *Sargent-Welch* is also dispositive of the charge found in Count I of Fontana's Complaint, that defendants and their co-conspirators attempted to monopolize the business of installing and selling avionics for Cessna aircraft in violation of section 2 of the Sherman Act.[13] In order to establish an unlawful attempt to monopolize, "it is incumbent upon the plaintiff to define the relevant market in which the defendant's actions are to be appraised. . . . [T]he market definition must include a description of both the territory encompassed and the product involved." *Mullis v. ARCO Petroleum Corp.*, 502 F.2d 290, 295 (7th Cir. 1974) (Stevens, J.) (footnotes omitted). A plaintiff suing under section 2 must allege a relevant market in its complaint, *Joyce v. Ritchie Tower Properties*, 417 F.Supp. 53, 56 (N.D.Ill.1976); *Brewer Sewing Supplies Co. v. Fritz Gegauf, Ltd.*, 1970 Trade Cases ¶ 73,139 (N.D.Ill.1970),[14] as Fontana has done in the case at bar,[15] and the market alleged must be legally cognizable.

As was pointed out by the court in *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d at 710,

[I]n determining what constitutes a relevant market for antitrust purposes, the goal is to "delineate markets which conform to areas of effective competition and to the realities of competitive practice," *L. G. Balfour Co. v. FTC*, 442 F.2d 1, 11 (7th Cir. 1971). The "area of effec-

---

**10.** Fontana does not allege that a tie-in existed with regard to any other type of Cessna aircraft. *See* note 9, *supra.*

**11.** In *Northern Pacific Ry. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), the Supreme Court remarked that "where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." *Id.* at 6, n. 4, 78 S.Ct. at 518. Upon investigation, this court has discovered but a single case in which an illegal tie-in was found to exist despite the availability of the tying and tied items on an individual basis. *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). But in that case, the court appears to have been motivated by its perception that the claimed separate availability of rented SCM Model 55 copiers and the supplies employed in operating them was entirely theoretical. 415 F.2d at 61–62. However, it is undisputed that, in this case, the tying products were in fact offered for sale to, and purchased by, Cessna dealers without the tied product throughout the relevant time period. Therefore, the court considers the ruling of *Advance Business Systems* to be inap-

plicable under the circumstances of the instant case, and follows the dictum of *Northern Pacific*, the rationale of which underlies the holding of the Court of Appeals in *Sargent-Welch*. See *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d at 708. Consequently, the court holds that the pricing policy adopted by Cessna does not constitute a tie-in in violation of the federal antitrust laws.

**12.** The court takes note of the fact that this issue was raised, in passing, in defendant's Reply and Supplemental briefs on this Motion.

**13.** It is unclear what other section 2 claims, if any, plaintiff means to raise in Count I of its Complaint. *Cf.* n.7, *supra*. However, in light of the court's disposition of its attempt claim, the presence or absence of any additional theoretical bases for this action under section 2 would be immaterial at this time.

**14.** The cases cited in this regard by Fontana in its Memorandum in Opposition are inapposite.

**15.** Throughout its briefs on this Motion, Fontana has adhered to the market definition proposed in its Complaint.

tive competition" may be a small submarket supplying specialized products or services. See *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 307–309 (7th Cir. 1976); *Cass Student Advertising, Inc. v. National Educational Advertising Services, Inc.*, 516 F.2d 1092, 1095 (7th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). See also *United States v. Connecticut National Bank*, 418 U.S. 656, 664, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974). In delineating a relevant submarket, we are to look at

> such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristic and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962).

The most important of these factors is uniqueness of the product's functions and therefore its uses. If two products are "reasonably interchangeable by consumers for the same purposes," they are considered to be in the same market. *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956); *United States v. Continental Can Co.*, 378 U.S. 441, 447–456, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964). See *Bendix Corp. v. Balax, Inc.*, 471 F.2d 149, 161 (7th Cir. 1972), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973). We have said on two relatively recent occasions, however, that a market definition "which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful." *Cass Student Advertising, Inc. v. National Educational Advertising Service, Inc., supra*, 516 F.2d at 1095, quoting from *L. G. Balfour Co. v. FTC, supra*, 442 F.2d at 11, which in turn quotes from *United States v. Bethlehem*

*Steel Corp.*, 168 F.Supp. 576, 592 (S.D.N.Y.1958).

While Fontana correctly notes that market definition is a factual question, *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 849 (5th Cir. 1975); also see *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d at 709, summary judgment may properly be entered against a plaintiff when he does not present a court with evidence sufficient to raise a question of fact as to the actual parameters of the relevant product market, and when the validity of the proposed market definition can be passed on as a matter of law. See *Tapeswitch Corp. of America v. Recora Co.*, 1977–2 Trade Cases ¶ 61,584 (N.D.Ill.1977); *Tire Sales Corp. v. Cities Service Oil Co.*, 410 F.Supp. 1222, 1230 (N.D.Ill.1976); *South End Oil Co. v. Texaco, Inc.*, 237 F.Supp. 650 (N.D.Ill.1965).

However, such is not the case here. Fontana insists that the relevant product market is "installing and selling avionics for Cessna aircraft." [16] Defendants deny that this is a legally cognizable product market. Their disagreement on this point can only be resolved by a fact finder.

In support of this position on this issue, defendants point out that Fontana's President, in his sworn deposition, had admitted that the same avionics can be installed in aircraft manufactured by Cessna and its competitors—i. e., that various makes of aircraft are, for those purposes, "interchangeable". In addition, it is undisputed that the various brands of aircraft compete with each other, as do the brands of avionics. Moreover, no uniqueness has been attributed by Fontana, which has been both a Cessna dealer and a dealer for Beachcraft, a competing aircraft manufacturer, to the process of installing avionics as Cessna craft. Finally, while plaintiff's President testified at his deposition that he was ignorant of whether or not Beachcraft or Piper sold their competitive planes unequipped,[17]

---

**16.** Although this is actually a product market and a service market, the court will refer to it merely as "the product market."

**17.** In his affidavit, Cessna's Senior Vice-President-Commercial Aircraft Marketing Division avers that "other" aircraft manufacturers allow

Fontana has neither asserted the materiality of this question to the present Motion nor maintained that it desires to undertake further discovery on this point.[18] Given these facts, defendants claim that they are entitled to summary judgment on the question of the validity of the alleged product market, analogizing this case to *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894 (10th Cir. 1975), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975) and *Advanced Business Systems & Supply Co. v. SCM Corp.*, 287 F.Supp. 143 (D.Md.1968), *aff'd*, 415 F.2d 55 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

Were these the only facts and allegations upon the record, perhaps it would be proper to enter summary judgment in favor of defendants with regard to the question at hand. However, there is another bit of evidence before the court that both renders inapposite the authorities relied on by defendants and creates a question of fact concerning the proper definition of the product market within which defendants' acts are to be assessed.[19]

During the course of his lengthy deposition, Fontana's President stated that Fontana's real competitors in the sale and installation of avionics are not dealers in other makes of airplanes, but other Cessna dealers. He attributed this phenomenon to the way consumers shop for airplanes. He implied that retail customers in this industry do not shop primarily for avionics or installation services, but for aircraft. Only after selecting the desired brand of airplane, he suggested, does a consumer consider the type of avionics that he would like to buy and who he would like to install it therein.

A fact finder might properly infer from this unrebutted testimony the existence of a market for "installing and selling avionics for Cessna aircraft", a market which is occupied solely, insofar as the evidence before the court shows, by Cessna dealers.[20] This is because, if these statements were to be accepted as true, and if the appropriate inferences were drawn therefrom, a fact finder might well conclude that the prices paid by purchasers of Cessna aircraft for avionics and their installation are not at all determined by, or restrained by, the prices charged by, for example, Beachcraft or Piper dealers, except insofar as the volume of industry-wide sales of avionics might affect the minimum wholesale price charged by the avionics manufacturers themselves. In sum, a fact finder might find that the proposed product market is characterized by distinct classes of vendors (Cessna dealers) and customers (purchasers of Cessna aircraft) and elasticity of prices among only

their dealers "to install various brands of competing avionics in various competing models of aircraft." He also swears that they "likewise factory install avionics manufactured by a variety of avionics manufacturers." This testimony stands uncontradicted.

18. Indeed, neither party even brought this portion of Mark Fontana's deposition to the attention of the court.

19. The court can not really fault defendants for their failure to bring this evidence to its attention. Fontana has not, in its briefs or in its affidavit, adduced one fact in support of its proposed product market definition. Nor does it allege any such fact in its Complaint. (This court has not been called upon to review the sufficiency of the Complaint in this regard.)

This court considers that plaintiff's omissions in this regard can only have been the result of an oversight on its part. After defendants' Motion had been fully briefed, and accompanying affidavits had been filed, the court, in a Memorandum Opinion dated March 6, 1978, requested the filing of additional briefs and affidavits concerning four issues. One of those issues was the question of the appropriate market definition for plaintiff's section 2 claim. No further affidavits were forthcoming from either party, and plaintiff, in its Supplemental Memorandum, merely asserted that its "relevant market definition flows directly from such factors as are set forth in *Sargent-Welch*."

20. While it may be true that a retail customer could buy a new, unequipped airplane from a Cessna dealer, go elsewhere to obtain avionics, and have them installed by people who are not employees of the Cessna dealer who sold him the plane, there is no claim on the record that that actually does happen. Rather, it appears that consumers go to a dealer to buy an operational—i. e., fully equipped—aircraft, and that that is what they do, in fact purchase. As was stressed by the court in *Sargent-Welch,* such real-world consumer conduct is of critical importance in fashioning appropriate product market definitions.

those vendors within the market. That is, a fact finder might properly find that this market represents a submarket within some greater, overall market for the sales and installation of avionics or the sales of airplanes, that it accurately describes a discrete arena of "active competition", *Mullis v. ARCO Petroleum Corp.*, 502 F.2d 290, 296 (7th Cir. 1974) (Stevens, J.). Thus, this court is obviously unable to conclude that defendants have met their burden of demonstrating to its satisfaction the nonexistence of any "genuine issue as to any material fact", and, under Rule 56(c), F.R.Civ.P., their Motion for summary judgment, insofar as it challenges the validity of the proposed product market, must be denied.

Nor do the cases upon which defendants principally rely dictate a contrary result.[21] In *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975), the question presented to the court was the propriety of a market definition largely restricted to peripheral devices plug compatible with IBM equipment. At issue in *Advanced Business Systems & Supply Co. v. SCM Corp.*, 287 F.Supp. 143 (D.Md.1968), *aff'd* 415 F.2d 55 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970), was whether paper used in SCM's electronic copying machines constituted a cognizable product market. In each case, the proposed market definition was rejected as too narrow.[22] The *Telex* court based its decision on its conclusion that all peripheral products were reasonably interchangeable. The *Advanced Business Systems* court based its decision on

the ground that the same paper can be used with all "direct" electrostatic copiers.

But in neither of those cases was a claim made that was truly comparable to the one made by plaintiff in the case at bar. Plaintiff here concedes that the competing types of avionics can be put into different brands of planes, although it is unsure of how installation costs compare. However, Fontana seems to be asserting that this physical interchangeability of parts is irrelevant, insofar as the purchaser of a Cessna aircraft has no real alternative to buying avionics from a Cessna dealer along with his Cessna craft, and having those avionics installed either by Cessna itself or by the dealer.

The *Sargent-Welch* court reiterated the importance of identifying consumer behavior patterns in determining the boundaries of a product market in a section 2 case. It proclaimed that "a market definition 'which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful'". 567 F.2d at 710 (citations omitted). Thus, the alleged difference between the viable options open to the purchasers in this case and those in the cases cited by defendants distinguishes the latter cases from the former, and renders the definition of the proper market in which to assess defendants' actions "a genuine question as to . . . [a] material fact" properly left for determination by a fact finder.

■ Defendants also challenge plaintiff's right to collect damages for the alleged section 2 violations, citing *Illinois Brick Co.*

---

21. *Heatransfer Corp. v. Volkswagenwerk*, 553 F.2d 964 (5th Cir. 1977), upon which plaintiff bases its argument, is also inapposite. In that case, a jury determination that "the manufacture and sale of air conditioners for only Volkswagen, Porche and Audi automobiles throughout the world," *id.* at 970, n.1, constituted a cognizable product market in an action under section 2 was upheld by the Fifth Circuit Court of Appeals. The court held that the jury's finding was supported by evidence showing that four companies

 produced air-conditioning units almost exclusively for VWoA [Volkswagen of America, Inc.] import cars, concentrating on this market because of the distinct engineering prob-

lems associated with the Volkswagen imports. Further, up until time of trial in this case, these four competitors were the sole suppliers of air-conditioners for VWoA. *Id.* at 980. No such allegations have been made in this case, and plaintiff's proposed product market definition is based on a wholly different theory of "uniqueness" from that employed in *Heatransfer*.

22. In *Telex*, the restrictive market definition was approved by the district court. *Telex Corp. v. IBM Corp.*, 367 F.Supp. 258 (1973). However, that determination was reversed on appeal.

*v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), in which the Supreme Court held that an indirect purchaser cannot sue under section 4 of the Clayton Act, 15 U.S.C. § 15 to recover damages incurred as a result of a direct purchaser's pass-on of an overcharge. This court agrees with defendants' analysis of the implications of *Illinois Brick* with regard to plaintiff's cause of action. Thus, the court enters summary judgment in favor of defendants on plaintiff's damage claims under section 2.[23]

Although it mentions several acts attributed to defendants and their alleged co-conspirators, Count I of plaintiff's Complaint seeks recovery of only those losses arising from CMP.[24] Plaintiff contends that it was put out of business because it was unable to compete with Cessna in the sales and installation of avionics on Cessna planes as long as that pricing policy remained in effect. Under that program, Fontana claims that it could not compete with Cessna dealers who sold factory—(ARCD) equipped aircraft, because Cessna, in effect, was either selling planes, accessories, or avionics to the latter group of dealers at reduced prices, providing them with cheap installation service or both.

However, Cessna sold its airplanes to its dealers through distributors. In Fontana's case, the middleman was Aviation Activities, Inc., an independent distributor of Cessna aircraft. All parties before the court agree that distributors like Aviation Activities, Inc., are free, under Cessna's marketing system, to charge Cessna dealers any price they want for Cessna products.[25] Therefore, given plaintiff's theory of its cause of action under section 2, the only possible way that Fontana could have been victimized by the alleged section 2 violation—i. e., Cessna's pricing scheme—in a manner entitling it to recompense under section 15 would be if Cessna's pricing policy was unlawful, and if Aviation Activities, Inc., adjusted its prices to reflect Cessna's. That is, to collect damages for defendants' alleged section 2 violation, Fontana must show that some distributors passed on the allegedly noncompetitive process for Cessna's packaged planes to some dealers; that Aviation Activities passed on the allegedly inflated prices Cessna charged it for unequipped aircraft to Fontana; and that Fontana was forced to go out of business due to its consequent inability to custom equip and sell Cessna airplanes.

Plaintiff seeks to distinguish *Illinois Brick* by pointing out that "Fontana is not suing to recover the difference in price between the inflated basic aircraft price and the normal price; it seeks to recover for the destruction of its heretofore profitable avionics-installation business." This is a distinction without a difference. In order to establish that the destruction of its business is attributable to defendants' alleged section 2 violation, Fontana must demonstrate that the changes made in 1975 in Cessna's own pricing policy covering its multi-engine planes caused corresponding changes in the pricing system of Cessna distributors, including Aviation Activities. It was exactly this type of damage that the *Illinois Brick* court held to be nonrecoverable in a section 4 suit. The fact that plaintiff is technically suing for consequential, and not just actual, damages is immaterial.

Nor is *Illinois Brick* rendered inapplicable by virtue of Fontana's claim that Cessna's

---

**23.** Accordingly, the court does not pass upon defendants' claim that plaintiff's damage claim is also barred by *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

**24.** Once again, the court must acknowledge that the ambiguity of plaintiff's Complaint has made the court's disposition of this Motion more difficult than it might otherwise have been. But, in light of the insight into plaintiff's cause of action provided by, *inter alia*, its briefs in opposition to the instant Motion, the court

has no doubt as to the correctness of its construction of plaintiff's Complaint. Of course, should plaintiff wish to allege that its losses were actually occasioned by other actions undertaken by defendants in violation of section 2, it is free to seek leave to file an Amended Complaint.

**25.** Therefore, plaintiff's case does not come within the "cost-plus contract" exception to the rule of *Illinois Brick*. See, 431 U.S. at 735–736, 97 S.Ct. 2061, 52 L.Ed.2d 707.

CMP program was part of a larger conspiracy involving many entities, including, perhaps, Aviation Activities. Even if plaintiff could show that Aviation Activities was a party to a conspiracy against it, to recover for the alleged section 2 violation, it would still have to prove that the distributor passed on Cessna's "inflated" airplane prices to it. In other words, since the claimed economic realities of the situation would be the same whether or not plaintiff bought its airplanes directly from a party to the conspiracy said to exist against it, *Illinois Brick* would preclude the recovery of the claimed damages from Cessna, regardless of whether or not plaintiff chose to pursue that recovery on a conspiracy theory.[26] While it may be that, if all the direct purchasers of Cessna's airplanes after the inauguration in 1975 of its pricing policy were parties to the conspiracy, or merely benefitted thereby, no one may in fact cause Cessna to return any of the gains that it might have acquired in violation of section 2, the Supreme Court recognized this possibility in *Illinois Brick*. 431 U.S. at 746, 97 S.Ct. 2061, 52 L.Ed.2d 707. Nonetheless, the Court held that plaintiffs like Fontana could not recover damages under section 4 for injuries caused by a pass-on of an improper overcharge, and this court is bound by that determination. Accordingly, summary judgment is granted in favor of defendants on plaintiff's request for damages flowing from defendants' alleged violation of section 2.[27]

In Count II of its Complaint, Fontana recites a litany of deeds that it avers were done by a combination and conspiracy to restrain trade in violation of section 1 of the Sherman Act.[28] However, the briefs on this Motion make it quite clear that plaintiff is only seeking damages in that Count, too, for losses arising from Cessna's pricing policy. Therefore, plaintiff's recovery of these damages via Count II is also barred in *Illinois Brick*.

Accordingly, the following disposition is made of defendants' Preliminary Motion for Summary Judgment: summary judgment is denied on the question of the cognizability of the alleged product market; summary judgment is granted in defendants' favor on plaintiff's tie-in claims; and summary judgment is granted in defendants' favor on plaintiff's damage claims.[29]

It is so ordered.

---

**26.** As plaintiff seeks to hold it liable, in Count I, solely by virtue of its alleged co-conspirator status, it is obvious that *Illinois Brick* also bars the recovery of damages from CFC on account of the alleged violation of section 2.

**27.** Since the legal injury that plaintiff appears to be claiming to have incurred as a result of the conspirators' alleged section 7 violation also flows from Cessna's pricing policy, *Illinois Brick* commands that the court grant summary judgment for defendants on that damage claim, as well.

Having disposed of defendants' motion on this basis, the court finds it unnecessary to consider the applicability of *Brunswick Corp. v.* *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) to the facts of this case.

**28.** Plaintiff charges this conspiracy, the parties to which are not identical to those named in Count I, with, *inter alia*, vertical integration, price stabilization, and the imposition of geographic restrictions on sales by Cessna distributors and dealers.

**29.** Defendants have not directly challenged plaintiff's right to sue for equitable relief from the claimed violations of section 1 (Count II conspiracy), 2, and 7 under 15 U.S.C. § 26.