**SKOKIE GOLD STANDARD LIQUORS, INC., et al., Plaintiffs,**

v.

**JOSEPH E. SEAGRAM & SONS, INC., et al., Defendants.**

**No. 81C 2406.**

United States District Court,
N.D. Illinois, E.D.

Sept. 18, 1986.

**1312**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This Court's December 14, 1981 Findings of Fact and Conclusions of Law (the "Preliminary Injunction Decision") denied the motion of plaintiffs (collectively "Gold Standard") for issuance of a preliminary injunction after a five-day evidentiary hearing. On September 8, 1982 an unpublished order by our Court of Appeals (No. 82–1099, 692 F.2d 759) affirmed that denial by adopting the Preliminary Injunction Decision in its entirety, stating in the course of the Court of Appeals' one-page slip opinion:

> Since the plaintiffs do not challenge the district court's fact-finding and since its legal conclusions are correct also, we affirm on the basis of the attached district court opinion.

After some years of additional discovery, the parties have submitted both an evidentiary record (including some added live testimony, hundreds of pages of deposition testimony and cartons of exhibits) and ex-

tensive briefs [1] for decision on Gold Standard's right to a permanent injunction [2] to restrain defendants from directly or indirectly:

(a) raising and fixing the wholesale prices at which Seagram alcoholic liquor products to-wit:

(i) Seagram V.O. Canadian Whiskey;

(ii) Seagram 7 Crown Blended Whiskey;

(iii) Seagram Extra Dry Gin;

(iv) Seagram Crown Royal Canadian Whiskey;

(v) Myers's Rum;

(vi) Chivas Regal Scotch;

(vii) Chivas Regal Salute Scotch; and

(viii) Lochan Ora Liqueur.

are sold by Federated Distributors, Inc. ("Federated") and Capitol Wine and Liquor Co. ("Capitol") [3] to plaintiffs by means of lowering and fixing at identical levels the discounts on such products offered by Federated and Capitol;

(b) suppressing and restraining price competition between Federated and Capitol;

(c) fixing the wholesale prices of the aforementioned enumerated Seagram alcoholic liquor products at non-competitive levels; and

(d) depriving plaintiffs and the consuming public of the opportunity to purchase said alcoholic liquor products at competitive prices.

As part of the evidentiary record, the parties submitted a First Set of Stipulations ("FSS"), a copy of which is included here as Appendix 2 to this opinion's Findings of Fact ("Findings") and Conclusions of Law ("Conclusions").

1. Wholly apart from the respective proposed Findings and Conclusions submitted by the parties, their post-trial briefs exceed 210 pages in the aggregate.

2. At the outset of the preliminary injunction hearing, Gold Standard had waived damages and a jury trial. That has left only potential injunctive relief in issue.

3. [Footnote by this Court] On April 1, 1985 Federated purchased the assets of its competing distributor Capitol. On June 10, 1985, pursuant to motion, this Court dismissed Capitol and Sidney Friedman (its managing partner) as defendants, finding "this action has become moot as to Capitol and Friedman" because plaintiffs are seeking only injunctive relief. This Court further ruled that for "all procedural and evidentiary purposes ... Capitol and Friedman shall remain subject to the same rules and principles as though they were still defendants."

In making the following Findings and Conclusions this Court has considered (1) the parties' pleadings, affidavits and memoranda, (2) their respective counsel's arguments and statements, (3) the demeanor and credibility of each of the witnesses, (4) the exhibits and FSS admitted into evidence, (5) the deposition excerpts read into or otherwise made a part of the record and (6) the proposed Findings and Conclusions submitted by the parties. Based on the foregoing this Court makes the following Findings and Conclusions as required by Rule 52(a).[4]

### Findings of Fact

1. Except to the limited extent modified by these Findings, the original Preliminary Injunction Decision Findings (which, together with the associated Conclusions, are included here as Appendix 1 to these Findings and Conclusions[5]) are reconfirmed by this Court. All defined terms in the original Preliminary Injunction Decision Findings and the FSS will not be redefined here, but shall have the identical meaning as in those documents.

2. In September 1981 Binstein acquired the stock of his brother-in-law, Bernard Greenfield, in Enterprises. Since that time Binstein has owned 90% of the Enterprises stock (Binstein 12/13/82 Tr. 36–37).

*Absence of Price-Fixing: In General*

3. Seagram encourages its distributors to adopt its suggested prices, including suggested discounts. As to the latter, Seagram makes case-level suggestions. For example, in a given month on a given product, Seagram may suggest a $3 discount per case for a 3–case purchase and a $5 discount per case for a 5–case purchase (Klein Tr. 31–32; Schwartz Tr. 8–9; Friedman Tr. 73–75; Marszalek Tr. 116–17).

4. FF I ¶¶ 27–48 dealt with a number of parallel and nonparallel pricing decisions by Federated and Capitol in which either or both of them, from time to time, either followed or refused to follow Seagram's suggestions. Other instances in the record include these:

(a) In November 1980 Klein decided Federated would follow Seagram's suggestions for the Scotch products distributed by General Wine as of January 1, 1981. Klein so informed General Wine and published Federated's new prices to the trade in mid-December pursuant to Federated's usual practice (Tr. 772–73, 797). Capitol again followed Federated and published its new prices for the same three products to the trade in the third week of December 1980 (Tr. 1054–55). However, at least by March 1981 neither Federated nor Capitol was following Seagram's suggested discounts in its prices offered to Gold Standard. From March 1981 Gold Standard and others received discounts on Chivas Regal from Federated and Capitol that differed from, and were greater than, the discounts suggested by Seagram (PX 85, PX 89; Colettis Tr. 11–21).

(b) In November 1980 Seagram wished to reduce the discounts on Seagram Gin, but neither Federated nor Capitol followed the suggestion, apparently because each wanted to continue pricing Seagram Gin aggressively (Schwartz Tr. 234–37).

(c) In March 1981 Seagram suggested a discount on Myers's Rum to increase shelf distribution. Seagram's proposed program, entitled the Team President Pack, consisted of offering special discounts on mixed cases of the three larger sizes. Both Federated and Capitol independently rejected that discount suggestion (Schwartz Tr. 278–82).

(d) In August 1981 Seagram suggested 1–case and 3–case discounts on Myers's Rum. Federated rejected Seagram's suggested discounts and offered its retail customers greater discounts (Schwartz Tr. 118).

---

4. To the extent if any the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent if any the Conclusions as stated reflect factual findings, they shall be deemed Findings.

5. References to the Preliminary Injunction Decision Findings will take the form "FF I ¶ —."

5. Seagram's urging each of Federated and Capitol to adopt and adhere to Seagram's suggested list prices and suggested discounts never, either in early 1979 or at any other time, included either an express or implied threat of cancellation of the distributors' franchises or other retaliation (Haimann Tr. 26–27). Both Federated and Capitol are highly valuable distributors with large organizations, and Seagram's continuing efforts at persuasion rather than threats confirm the importance of both distributors to Seagram.

6. At all times the pricing decisions of Federated and Capitol for Seagram alcoholic liquor products were unilateral business decisions by Federated and Capitol and were not the result of agreement with each other, or between them, or either of them, with Seagram (Klein Tr. 26–28; Friedman Tr. 70–75; Hackman Tr. 20–21; Smith Tr. 43–44; Bonchick Tr. 22–24).

*Overpricing*

7. Almost in its entirety, the deposition testimony and documents that followed the preliminary injunction hearing related to the subject of "overpricing" and promotional activity. That evidence, including matters covered in FFS, is dealt with in the following Findings.[6]

8. Seagram's pricing practices are reflective of the legal pricing structure imposed on the liquor industry by the statutes in force in a large number of states in the United States. In that respect, Seagram does business in two types of states: (a) affirmation and control states and (b) non-affirmation states. Affirmation and control states impose a "most favored nation" requirement: Seagram must sell its goods to distributors at the lowest F.O.B. price that it charges to any other distributor in the country.[7] In non-affirmation states Seagram can charge its distributors any price it chooses for its goods. Illinois is a non-affirmation state (FSS ¶ 1).

9. "Overpricing" is a term used in non-affirmation states such as Illinois in instances where Seagram's F.O.B. selling price to the distributor is greater than the Affirmation Price for the same brand and size. That difference is termed "overpricing" (e.g., if the Metro Chicago price is $52 per case and the Affirmation Price is $50 per case, Seagram's "overpricing" is $2 per case) (FSS ¶ 2).

10. All overpricing is returned to the distributor in the form of "Credit Memos," each of which sets forth the amount of overpricing generated by the distributor for a particular period, generally the preceding calendar month (FSS ¶ 4). All funds represented by any Credit Memo belong to the distributor that receives the Credit Memo, thus reducing the *actual* purchase price of the goods to the Affirmation Price even in non-affirmation states such as Illinois.

11. As Finding 10 reflects, the same economic pricing effect would be accomplished by Seagram's billing of its distributors at the Affirmation Price even in non-affirmation states such as Illinois, rather than by its engaging in the practice of overpricing and generating Credit Memos.

---

**6.** Gold Standard has pursued its claim doggedly (though inconsistently) in this Court. Initially it claimed blatant price-fixing evidenced by conscious parallelism. When it struck out on that (that was the effect of the Preliminary Injunction Decision and its affirmance), Gold Standard shifted ground to claim the issuance of Credit Memos (see Finding 10) was held hostage by Seagram to make sure the distributors capitulated to its pricing demands. When Gold Standard came up empty on that score, it blithely moved to still another theory—this time that the overpricing-plus-Credit-Memo arrangement was really a sham, disguising a coercive price-fixing arrangement. Each successive shift has moved farther and farther from what the case was about at the beginning, and what it should have continued to be about: a price-fixing con-

spiracy in restraint of trade. But as the further Findings and Conclusions will reflect, Gold Standard's latest effort to reshape the facts is unavailing too.

**7.** This past Term the United States Supreme Court held the New York statutory affirmation-price requirement invalid under the Commerce Clause, *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, —— U.S. ——, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). That decision does not, of course, affect the validity of Seagram's conduct in having previously adhered to the requirements of such statutes and, concurrently, having adopted the pricing practice described in this opinion.

But the latter practice has developed as a common industry-wide practice engaged in by numerous other suppliers—for example, by 16 other suppliers that have distributed to Federated or Capitol (until it was sold), or both, in the Metro Chicago Market (FSS ¶ 6). It is a practice that serves useful business purposes:

(a) From the point of view of a supplier such as Seagram, it reflects the hope distributors will use the amount of the Credit Memos (though all such amounts are the distributors' own funds) to promote the effective sale of Seagram products in the Metro Chicago market.

(b) From the point of view of the distributor, the amount of the Credit Memos provides an indication of what it may find desirable and feasible to spend on such promotion consistently with the distributor's profit margin on such products.

12. From time to time the Seagram national office will offer "Special Promotional Allowances" ("SPAs") to its distributors on a national basis: reductions in the F.O.B. price, generally offered to distributors in conjunction with a national promotional program for a particular product. For example, Seagram Distillers may offer its distributors an SPA of $1 per case of a particular product purchased in a particular month. As in the case of overpricing, the amount of the SPA is given to the distributor in the form of a Credit Memo (FSS ¶ 7).

13. As an administrative matter, overpricing and SPA Credit Memos are issued to distributors in this manner (FSS ¶ 8):

(a) At some time after the month of shipment, a Seagram clerk in the Des Plaines office forwards to the Seagram New York office a request for a Credit Memo in an amount determined by the number of cases sold to a particular distributor, multiplied by the amount of ov-

erpricing or SPA, or both, applicable for each brand and size.

(b) After the Credit Memo request is received in New York, a clerk in the New York office verifies the amount of credit requested by the Division office in Chicago with respect to that particular distributor. In that connection, the clerk checks the shipments to the distributor for the period requested as well as the amount of the applicable overpricing or SPA allowance, or both.

(c) Once that clerical routine has been completed and the amount requested verified, the Credit Memo is signed by a national office management employee and forwarded to the Accounts Payable Department in New York, which issues the Credit Memos and sends them to the distributor (most often more than 30 days after delivery of the products that generated their issuance, FSS ¶ 9).

14. Each Credit Memo gives rise to a debit entry on the distributor's books in its Accounts Payable account, thus effectively reducing the price of the goods by reducing the amount the distributor owes Seagram. Accordingly each distributor deducts the amount of the Credit Memos from the face amounts of past or future bills received from Seagram for goods sold to the distributors (FSS ¶ 11(b)). When that is done, the distributor does not (of course) reduce the balance in its internal promotional account referred to in Finding 15.

15. Upon receipt of a Credit Memo, each distributor also makes a ledger entry for that amount in an internal account designated by the distributor as the Seagram Bank[8] or Promotional Account. Each distributor maintains separate internal accounts for Credit Memos received from Seagram Distillers, from General Wine and from many other suppliers (as Finding 11

---

**8.** That term, though adopted and used by the distributors and Seagram for convenient reference, has unfortunate side effects. It has contributed to the manner in which Gold Standard's counsel have been led astray (though, as n. 6 reflects, they needed no encouragement in that respect), and it has doubtless led to some of the occasional errors referred to in Finding 21. Of course it is not really a "Bank," but simply a bookkeeping account akin to a reserve; and the name "Seagram" simply reflects its origin, stemming from the sale of Seagram products (to distinguish like "Banks" stemming from the sale of other suppliers' products), *not* ownership of the funds by Seagram. As subsequent Findings reflect, the Seagram Banks are *not* accounts payable to Seagram from Federated and Capitol, respectively.

reflects, the overbilling practice is common in the industry) (FSS ¶¶ 11(a) and (b)).

16. Seagram's business practices of overpricing and issuing Credit Memos are followed in the hope the distributors will use that amount of money to promote the sales of Seagram products. Those business practices do not reflect any economic threat or coercion. That factual conclusion is supported by the record as a whole, including but not limited to the following facts:

(a) In 1978–79, throughout the period when the Chicago Metro market was in the "chaotic" condition described in FF I ¶ 28 and the distributors were *not* following Seagram's suggested net prices, Seagram continued to issue Credit Memos to its distributors in the same manner as it did when the distributors *did* announce identical prices. There was never any withholding by Seagram of Credit Memos pending pricing decisions by the distributors.

(b) Since May 1, 1979 (the beginning of the alleged conspiracy), Federated and Capitol have made several price changes that were not pursuant to any Seagram suggestions (see FF I ¶¶ 42–44 and 48 and this opinion's Finding 4). In each instance Credit Memos were issued to the distributors regularly and in the ordinary course of business. In no instance is there any evidence that Seagram delayed or withheld Credit Memos in response to the distributors' pricing decisions.

(c) Seagram's General Wine Division has continued to issue Credit Memos to the distributors despite the fact that the distributors have not followed the discounts suggested by Seagram for the Scotch products.

(d) Federated (and Capitol before it was acquired by Federated) apply their Credit Memos against their billings on shipments from Seagram, thus confirming the nature of those amounts as real price reductions to the Affirmation Prices. As for the corresponding Promotional Accounts in the amount of the Credit Memos, the distributors are free to, and do, apply their promotional expenditures and charge them against those accounts in any manner they choose and without reference to any direction from Seagram.

(e) Requests for Credit Memos made by the Seagram Des Plaines office to the Seagram New York office are made in the normal course of business some time after the month of shipment and are thereafter processed and issued by the New York office. Issuance of Credit Memos to the distributors is not contingent upon the distributors adhering to suggested discounts or doing anything other than simply ordering the goods when the purchase price exceeds the Affirmation Price.

*National and Local Promotional Programs*

17. Distributors may engage in promotional activities either on their own or by participating—at their election and not as a matter of compulsion—in national or local promotional programs arranged by Seagram. In either event, the distributor pays for such activity (or its ratable share, as the case may be) by a check out of its own funds.

18. As an internal accounting matter, a distributor sometimes reduces its internal account designated on its books as the Seagram Bank or Promotional Fund by the amount spent on a promotion; at other times, the distributor elects to charge such promotion expenditure against its Cost of Sales account, thus directly reducing its general profits by the amount of the expenditure (Klein Tr. 23, 126, 256–58, 277–79). That choice is based on the relative status of the different accounts from time to time and on the internal incentive considerations of the distributor—but in either event the realities of who bears the expense (the distributor, not Seagram) are unchanged. Seagram does not *instruct* the distributors to charge certain promotional expenditures against their internal promotional account, while other promotional expenditures are to be charged against their Cost of Sales or general profit account (Coffey Tr. 18–19). True enough,

Seagram may from time to time suggest to a distributor that it allocate certain expenditures against its promotional account and other expenditures against other accounts (Galletta Tr. 31–34). When Seagram does this, it is with the hope that the distributor will spend more money on Seagram promotional activity than the distributor has allocated to its promotional account (Schwartz Tr. 69–74).

19. Though a contrary finding would not change the legal conclusions here, in fact Seagram does not audit the distributors' internal promotional funds (despite Gold Seal's fervent assertions to the contrary). As already stated, Seagram does make promotional suggestions to the distributors. Capitol chose to inform Seagram of its promotional expenditures in some detail, while Federated independently chooses to inform Seagram of its promotional expenditures in more general terms (Goldfarb Tr. 7; Schwartz Tr. 229; Marszalek 11/17/82 Tr. 38; Klein Tr. 441–42; FSS ¶ 11(d)). As a business matter, it is important to keep Seagram informed of the level of promotional expenditure for at least two reasons: first, so that Seagram does not plan its proposed promotional programs, in which it is suggesting that the distributors participate in such promotional expenditures, at a level disproportionate to the amount of money the distributors have allocated for promotional activity; and second, to enable Seagram to ascertain whether various promotional campaigns have succeeded in increasing sales of Seagram products. Thus, for example, Klein's January 15, 1980 letter request to Maury Hornstein (Schwartz's predecessor) (PX 21–A(1)) is nothing more than Klein's request that Seagram coordinate its promotional programs with the money set aside by Klein for promotion of Seagram products (Marszalek 7/12/82 Tr. 20–27; 1/20/83 Tr. 239).

20. Similarly, Seagram may suggest from time to time that the distributors subsidize their case-sale discounts to their retail accounts by applying their promotional fund "monies" to support those discounts. That is accomplished by the distributor's reducing the amount of its internal promotional account by whatever amount is deemed appropriate to support its retail discounts. In that way, the distributor reduces the amount of its own money that reflects what it contemplates spending on promotional activity and correspondingly increases the discount level it can offer to its retail customers without reducing its gross profit margin (Klein Tr. 48–49, 354, 486; Schwartz Tr. 122, 234–35; Galletta Tr. 90–92; Friedman Tr. 52–56). Again that represents a convenient way for the distributor to reflect its business judgments for accounting purposes, but the economic realities remain the same: It is the distributor and not Seagram that bears the cost involved.

21. As confirmed by the many pages devoted to the overpricing and Seagram Bank transactions in the parties' memoranda—reflecting different, and frequently confused, factual understandings of the transactions themselves as well as of the conclusions to be drawn from them—the bookkeeping handling of the accounts is not a simple matter. That is inherent in their origin, induced as it is by the legal restrictions imposed by other states' establishment of an Affirmation Price requirement. There is little wonder Gold Standard has been able to pick out a handful of mishandled items out of thousands of entries over a span of several years, reflecting an occasional like bit of confusion on the part of bookkeeping or other clerical personnel. Those items represent at worst a few hundreds or thousands of dollars out of *millions* that have moved through the accounts involved. Such minor errors, individually or in the aggregate, do not change the overall previously-stated business reality: that the distributors operate their businesses and set their prices independently of any asserted coercion on Seagram's part. And the same finding applies to negate the sinister inferences Gold Standard would draw from the occasional colloquialism (e.g., Schwartz's "bill me back" note) used by personnel of the distributors or Seagram in communicating—as the law permits—about promotional plans or expenditures.

*Binstein Evidence*

22. This Court does not credit the belated testimony and memoranda (PX 91) offered by Binstein as to his alleged conversations with Herbert Kerman, Seagram's Central Division Manager in the mid–1970s, as to Seagram's asserted use of the Bank as its own money to control the distributors. That testimony and those purported memoranda (which collectively assert that the Credit Memos were issued by the distributors at Seagram's direction in quite arbitrary amounts, unrelated to Gold Standard's purchases from the respective distributors) are wholly without support in the evidence. On the contrary, the years-old documentation Federated was able to marshal—by searching its warehouse records after the issue had surfaced late in the litigation—was totally inconsistent with Binstein's version: Instead, it reflected Credit Memos from Federated to Binstein that were *always* directly proportionate to Binstein's case purchase of goods from Federated. Even apart from the questions of relevance posed by defendants (D. Post-Trial Br. 90–92), Binstein's evidence is both contradicted by the objective evidence and inherently suspect because of the circumstances and timing of its being offered. It is simply too pat for this important "evidence" to have emerged so conveniently—like Aphrodite rising full-blown from the waves—after Binstein's total silence on any such matters during the course of extensive examination (both during depositions and on the stand during the preliminary injunction hearing), as well as his testimony during the initial hearing that he never made memoranda about his conversations and meetings. It is hardly coincidental that such matters were "discovered" only when Gold Standard's theory of anticompetitive conduct shifted once again, after its earlier theories had come up empty in

evidentiary terms.[9] In sum, even were the new "evidence" materially probative on the real issues dealt with here (a doubtful premise), this Court would not find them sufficiently credible.

*Conclusions of Law*

1. This Court has jurisdiction of the parties and of the subject matter of this proceeding under Sherman Act § 1 (15 U.S.C. § 1), Clayton Act §§ 4 and 16 (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

2. To be entitled to permanent injunctive relief, Gold Standard must demonstrate that (a) defendants violated the antitrust laws and (b) plaintiffs face a "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue to recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969); *Bender v. Southland Corp.*, 749 F.2d 1205, 1214 (6th Cir.1984); *Rosebrough Monument Co. v. Memorial Park Cemetery*, 666 F.2d 1130, 1147 (8th Cir.1981).

3. "Something more" than Seagram's suggestions of resale prices, coupled with persuasion or urging their adoption, must be shown to impose antitrust liability on Seagram. *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 707 (7th Cir.1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Chisholm Brothers Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1140–41 (9th Cir.1974); *Susser v. Carvel Corp.*, 332 F.2d 505, 510 (2d Cir. 1964), *cert. dismissed*, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). Gold Standard has shown nothing "more" on Seagram's part than its continuing to suggest resale prices to Federated and Capitol

---

9. Gold Standard Post-Trial R.Br. 74–79 seeks to "explain" the late-blooming evidence by saying Binstein did not earlier appreciate its significance. This Court's observation of Binstein during his live testimony in the preliminary injunction hearing disclosed him to be an astute witness—much more canny as to the nuances of conduct, and as to the possibility of what he perceived as anticompetitive inferences, than

his opposite numbers who testified for defendants. It strains credulity to suggest his flat answers, to the effect (1) he knew of no other facts and (2) he had no written memoranda or other documents in the subject matter areas about which he was interrogated, were the result of his not then perceiving the issues as he came to do later.

after it knew that they had adopted and were continuing to follow those suggestions. Seagram was thus a catalyst facilitating "conscious parallelism" by Federated and Capitol without their *agreeing* to charge identical prices. That has not been recognized as a ground for imposing liability for vertical price-fixing under the antitrust laws.

■ 4. "Something more" than conscious parallelism in competitors' pricing—what are often termed one or more "plus factors"—must be shown to impose antitrust liability on Federated and Capitol. *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457, 462–63 (7th Cir.1981); *Admiral Theatre Corp. v. Douglas Theatre Corp.*, 585 F.2d 877, 884 (8th Cir.1978). Because Federated's and Capitol's conduct was no different from what competitors might engage in under normal competitive conditions, Gold Standard has not met that burden.

5. Seagram's promotional activities and the distributors' methods of handling their own Promotional Accounts (which methods, not incidentally, differed as between Federated and Capitol) do not supply the required "something more" that is necessary to impose antitrust liability on Seagram. Seagram places no conditions on the issuance of Credit Memos to Federated and Capitol, and the latter are free to use or not to use the monies represented by the credit thus generated in any manner that they determine. In point of fact, Federated and Capitol *have* determined—without coercion from Seagram—how their own funds will be used.

■ 6. Even if Gold Standard had shown (as it has not) Seagram requires its distributors to promote Seagram products in the manner suggested by Seagram, Gold Standard would have failed to prove a violation of the antitrust laws. Any such requirement of adherence to non-price vertical restrictions would not, on the facts of this case, run afoul of the antitrust laws, because Gold Standard has also not shown such claimed restrictions violate the "rule of reason"—that they have either a negative effect on competition or are without

any redeeming virtue at all. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 57–58, 97 S.Ct. 2549, 2561, 53 L.Ed.2d 568 (1977); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 759 n. 6, 761, 104 S.Ct. 1464, 1468–69 n. 6, 1469, 79 L.Ed.2d 775 (1984). To the contrary, in this case the promotional activity that Gold Standard contends is mandated by Seagram has no real adverse effect on intrabrand competition to counterbalance its positive effect of stimulating interbrand competition.

■ 7. Virtually all Gold Standard's post-preliminary-injunction hearing deposition testimony and documents has related to overpricing and promotional activity. But Gold Standard's evidence in that area shows nothing more than legitimate business activity on defendants' part. For example, Gold Standard has shown Seagram (a) communicates regularly with its distributors on a multitude of subjects, including prices and marketing, and (b) is generally interested in and tries to determine the level of its distributors' promotional expenditures. But such evidence neither shows nor implies a price-fixing conspiracy. Neither Gold Standard nor this Court may fairly infer an agreement from nothing more than communication about such legitimate concerns. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. at 762, 104 S.Ct. at 1470. Nor may Gold Standard or this Court fairly infer that Seagram audits and controls the distributors' Promotional Accounts merely from evidence that Seagram is generally interested in the level and type of promotional expenditures. *Id.* at 762–63, 104 S.Ct. at 1470. To allow Gold Standard to draw such inferences from evidence of permissible business practices "could deter or penalize perfectly legitimate conduct." *Id.* at 763, 104 S.Ct. at 1470.

\* \* \*

Gold Standard's "Proposed Findings of Fact and Conclusions of Law" begin by setting up Gold Standard's own hurdles in this litigation (footnotes omitted):

Plaintiffs seek a permanent injunction to restrain defendants from directly or indirectly raising and fixing the wholesale prices at which the alcoholic liquor products of Joseph E. Seagram & Sons, Inc. ("Seagram"), marketed through its Seagram Division, are sold by Federated Distributors, Inc. ("Federated") to plaintiffs and other retailers by means of mutual understandings and prior assurances obtained through the use of economic coercion. Plaintiffs contend that such economic coercion results from (i) Seagram's proprietary interest in a Federal [sic] ledger account known as the "Seagram Bank," (ii) the economic and financial significance to Federated of price supports funded through that account, and (iii) the "redundant" correlation of specific levels of "suggested" price support with specific "suggested" resale prices coupled with a "meaningful event" if there is non-compliance.

Even apart from the strained notion of "meaningful event" for which Gold Standard contends, it has utterly failed to support those contentions. Neither economic coercion nor price-fixing—either direct or indirect—has been shown in this case. Gold Standard has failed to deliver as advertised. Accordingly it is ordered that this action be dismissed on the merits.

## APPENDIX 1

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Introduction

This Court conducted an evidentiary hearing (the "Hearing") July 6, 7 and 8 and August 17 and 18, 1981 on plaintiffs' motion under Fed.R.Civ.P. ("Rule") 65(a) for a preliminary injunction to restrain defendants, pending final determination of this action, from directly or indirectly:

"(a) Raising and fixing the wholesale prices at which Seagram alcoholic liquor products to-wit:

(i) Seagram V.O. Canadian Whiskey;

(ii) Seagram 7 Crown Blended Whiskey;

(iii) Seagram Extra Dry Gin;

(iv) Seagram Crown Royal Canadian Whiskey;

(v) Myers's Rum;

(vi) Chivas Regal Scotch;

(vii) Chivas Regal Salute Scotch; and

(viii) Lochan Ora Liqueur.

are sold by Federated Distributors, Inc. ("Federated") and Capitol Wine and Liquor Co. ("Capitol") to plaintiffs by means of lowering and fixing at identical levels the discounts on such products offered by Federated and Capitol;

(b) Suppressing and restraining wholesale price competition between Federated and Capitol;

(c) Fixing the wholesale prices of the aforementioned enumerated Seagram alcoholic liquor products at non-competitive levels; and

(d) Depriving plaintiffs and the consuming public of the opportunity to purchase said alcoholic liquor products at competitive prices."

At the Hearing each party was afforded and exercised the full opportunity to present evidence bearing upon all relevant issues, to examine and cross-examine each other party's witnesses and to object to the admissibility of each other party's evidence.

In making the following findings of fact ("Findings") and conclusions of law ("Conclusions") this Court has considered (1) the parties' pleadings, affidavits and memoranda, (2) their respective counsel's arguments and statements, (3) the demeanor and credibility of each of the witnesses, (4) the exhibits admitted into evidence, (5) the deposition excerpts read into the record and (6) the proposed Findings and Conclusions submitted by the parties. Based on the foregoing this Court makes the following Findings and Conclusions as required by Rule 52(a):

### Findings of Fact
### Plaintiffs (collectively "Gold Standard")

1. Each of the 11 plaintiffs is an Illinois corporation that has or had its own retail liquor license or licenses for the one retail liquor store it operates (Tr. 52, 53, 278).

2. Harold Binstein ("Binstein") is the President of each plaintiff (Supp.Aff. ¶ 1). Each plaintiff's stock is owned by Gold Standard Enterprises, Inc. ("Enterprises"), of which Binstein is President. Ninety percent of the stock of Enterprises is owned by Binstein and his brother-in-law, Bernard Greenfield (Tr. 46, 47, 288, 1126, 1127).

3. Each plaintiff operates or operated its liquor store at the address indicated, in the county shown in parentheses (Supp.Aff. ¶ 12):

Skokie Gold Standard Liquors, 5100 West Dempster, Skokie, Illinois 60076 (Cook);

Ridge Gold Standard Liquors, Inc., 6630 North Ridge, Chicago, Illinois 60626 (Cook);

Gold Standard Liquors, Inc., 3012 North Broadway, Chicago, Illinois 60657 (Cook) (closed September 15, 1980, Tr. 61);

Waukegan Gold Standard Liquors, Inc., 1501 North Lewis, Waukegan, Illinois 60085 (Lake);

North Shore Gold Standard Liquors, Inc., 153 Skokie Valley Highway, Highland Park, Illinois 60035 (Lake);

River Grove Gold Standard Liquors, Inc., 3121 Thatcher, River Grove, Illinois 60171 (Cook);

Cheese Chalet I, Ltd., 444 West Fullerton, Chicago, Illinois 60614 (Cook);

Chalet Wine & Cheese Shop, Ltd., 405 West Armitage, Chicago, Illinois (Cook);

Cheese Chalet III, Ltd., 1525 East 53rd Street, Chicago, Illinois 60615 (Cook);

Cheese Chalet IV, Ltd., 71 Linden, Glencoe, Illinois 60022 (Cook);

Chalet International, Ltd., 3000 North Clark Street, Chicago, Illinois 60657 (Cook).

*Defendants*

4. Joseph E. Seagram & Sons, Inc. ("Seagram") is an Indiana corporation with its principal place of business in New York City. Seagram maintains offices and transacts business in Chicago. Seagram's 1980 sales aggregated some $2.5 billion. Five of the eight Seagram products involved in this action (V.O., Seven Crown, Gin, Crown Royal and Myers's Rum) are marketed by Seagram Distillers Co. ("Dis-

tillers"), a Seagram division (Tr. 422). Three of the eight (the "Scotches," Chivas Regal Scotch, Chivas Royal Salute Scotch and Lochan Ora Liqueur) are marketed by General Wine & Spirits ("General Wine"), another Seagram division (Tr. 796–96). Federated Distributors, Inc. ("Federated") and Capitol Wine and Liquor Co. ("Capitol") are Seagram's exclusive distributors of all the products referred to in this Finding 4 (the "Seagram Products") in Cook County and for designated retail accounts in Lake and DuPage Counties (Tr. 77–78, 82–84, 425–26), with the limited exception as to the Scotches stated in Finding 17. No one else is authorized to sell the Seagram Products to retailers such as Gold Standard.

5. Federated is an Illinois corporation with its principal place of business in Chicago. Federated buys the Seagram Products from Seagram and resells them and many other alcoholic beverages to liquor retailers in Cook, Lake and DuPage Counties through its South Shore Liquors and Old Rose Distributing Co. divisions, which have about 117 salesmen (Tr. 840). Seagram Product sales represent a full 25% of Federated's business (Tr. 848). From its 550,-000 case capacity warehouse Federated serves 8 to 9,000 retail accounts with its 55 trucks (Tr. 586, 592).

6. Benjamin Klein ("Klein") has been Executive Vice-President of Federated in charge of marketing and sales since late October 1978 (Tr. 537, 582). Before joining Federated Klein had been the Vice-President, Central Division Manager for Seagram's General Wine, with marketing responsibilities including Cook and Lake Counties (Tr. 581).

7. Capitol is a partnership with its principal place of business in Chicago. Capitol buys the Seagram Products from Seagram and resells them and many other alcoholic beverages to liquor retailers in Cook and Lake Counties, employing about 65 salesmen (Tr. 842). Capitol sells approximately 1.1 million cases of spirits (which represent about 70–80% of that total) and wine per year (Tr. 1070).

8. Sidney Friedman ("Friedman") is a partner in Capitol, has been with Capitol since 1938 and has been in charge of its marketing and sales for many years (Tr. 543, 548–49, 984, 1000).

*Nature of the Action*

9. On April 29, 1981 Gold Standard sued Seagram, Federated, Capitol, Klein and Friedman, alleging a conspiracy to "raise and fix the wholesale prices" at which the Seagram Products are sold by Federated and Capitol to Gold Standard and other liquor retailers in violation of Sherman Act § 1, 15 U.S.C. § 1.

10. Gold Standard's theory is that defendants' conspiracy was formed between January 1, 1979, when Joseph Galletta ("Galletta") became Central Division Manager of Distillers (Tr. 426), and May 1, 1979 (Tr. 437), when Capitol and Federated allegedly put into effect an agreement with Seagram to adopt identical discounts, which discounts Seagram had assertedly imposed upon them "after four months of unacceptable pressure" (P.FF.Resp. 10).

11. Complaint ¶ 15 sought preliminary and permanent injunctive relief and a judgment for three times Gold Standard's actual damages. However, at the opening of the Hearing Gold Standard's counsel withdrew the complaint allegations seeking damages (Tr. 6).

12. Complaint ¶ 12(f) alleges that for some years before 1979 Federated and Capitol sold the Seagram Products to Gold Standard at "actual wholesale discount prices which, in most instances, differed from each other's."

13. Complaint ¶¶ 12(g), (h) and (i) allege that pursuant to the alleged conspiracy Federated and Capitol began selling four Seagram products (V.O., Seven Crown, Gin and Crown Royal) at uniform and identical prices May 1, 1979, began pricing Myers's Rum the same way August 1, 1980 and began doing the same as to the Scotches January 1, 1981.

14. On June 11, 1981 Gold Standard filed a supplemental affidavit by Binstein claiming that the closing of the store of plaintiff Gold Standard Liquors, Inc. at 3012 N. Broadway was "a proximate result of defendants' price fixing scheme" and that "if Federated and Capitol continue to sell Seagram products at fixed prices the stores remaining in operation will also be forced out of business" (Supp.Aff. ¶ 9).

*Gold Standard's Purchasing and Marketing Strategies*

15. At all relevant times Binstein has been in charge of purchasing alcoholic beverages for each plaintiff. Although defendants sought to discredit various of Binstein's techniques in seeking to play off one supplier against another (Tr. 274–76, 121), all of his purchasing practices comprised legitimate exercises of a free enterprise system effort to obtain the best possible prices. Federated and Capitol, each of which had and has substantially greater bargaining strength than Gold Standard, are hardly in a position to complain about Binstein's "practices" and "tactics" in that respect (D.FF. 15–17).

16. Defendants also refer (D.FF. 18) to Binstein's claimed ability to purchase Seagram Products from a Lake County Seagram distributor, Lake Shore Distributors (owned by Federated, Tr. 84), at prices different from and lower than the prices of Federated and Capitol (Tr. 212, 227, 246, 348, 349). That was not consistently true (Tr. 348) and in any event could affect only the two Lake County plaintiffs referred to in Finding 3, not the other nine plaintiffs, because of the area distribution restrictions imposed by Seagram (Tr. 84).

17. All plaintiffs except Waukegan Gold Standard Liquors, Inc. have always been able to buy the Scotches from Continental Distribution Company ("Continental") (Tr. 77, 78, 214). That availability is however irrelevant, because Continental's prices did not become competitive until after Capitol and Federated began charging identical higher net prices in January 1981 (Tr. 79, 747–49, 802–03).

18. Binstein is and at all relevant times has been responsible for the marketing and advertising policies for each plaintiff. He sets the prices for each plaintiff's store (Tr. 262, 263). From his office at the Skokie store of plaintiff Gold Standard Liquors,

Inc., he watches the operation of each plaintiff's store on a weekly and sometimes daily basis (Tr. 105, 199).

19. Seagram V.O. is the fourth largest selling brand of all liquor in the United States, ranking No. 1 among imported whiskeys (Tr. 74). Seagram 7 Crown is the third largest seller of all brands, ranking No. 1 among blended whiskeys (Tr. 74, 513). Chivas Regal ranks No. 1 in sales among all 12–year-old Scotch whiskeys (Tr. 76), and Chivas Regal Salute ranks No. 1 among all 21–year-old Scotch whiskeys (*id.*). Because Binstein believes that the Seagram Products are "in a class all by themselves" and "very unique, very powerful brands," he adopted the practice of advertising and selling Seagram brands in Chicago metropolitan newspapers for sale at Gold Standard's cost or below to enable Gold Standard's stores to acquire the image of discount houses and thereby attract heavy store traffic. For example when Seagram V.O. is so advertised by Gold Standard it brings in two times as much store traffic as like advertising of its nearest competitor, Canadian Club (Tr. 104). All such advertising is intended to and does generate a volume of customers who, once inside Gold Standard's stores, also purchase their many other products that produce a profit margin much higher than alcoholic liquors (Tr. 84–86, 197, 255).

20. Defendants assert (D.FF. 21) that "in recent times, at least, Mr. Binstein has been selling such Seagram products at higher prices than most of the larger package stores and many small stores (Tr. 91, 92, 254, 299, 1077–78; see also D.Ex. 113, 114 and 115, Supp.Aff. ¶ 9)." That argument is not fully supported by the record and, more important, is disingenuous. It reflects Binstein's business decision not to promote Seagram Products as "door openers" once their cost to Gold Standard (as the result of defendants' complained-of conduct) became too high to permit their economic use in that fashion.

21. Binstein testified that the key to the success of Gold Standard's stores has been the marketing practices referred to in Finding 19 as to the Seagram Products (Tr.

255). In his belief the "most exciting" Seagram Products were V.O., Seven Crown, Crown Royal and Chivas Regal (Tr. 84), Seagram's Gin was not "as exciting" (Tr. 86), Myers's Rum was an "insignificant product," and Chivas Royal Salute and Lochan Ora Liqueurs were "very limited products" (Tr. 133, 155).

22. Defendants assert (D.FF. 24) that "even the most exciting Seagram products are neither as unique nor as relied upon by the plaintiffs for their success as claimed by Mr. Binstein, [as] shown by other evidence." D.FF. 25–26 refer to such evidence, and D.FF. 27 states that "plaintiffs had and have a wide range of alcoholic beverages as popular as the Seagram brands to use in a marketing program of advertising and selling at cost or below to attract customers to their stores." That argument is not relevant to Gold Standard's claim. It is for Gold Standard not defendants to decide Gold Standard's marketing policies. Seagram Products have wide public acceptance, and if Gold Standard's conspiracy claims were valid it would be irrelevant that Gold Standard might alternatively choose to use non-Seagram products as "door openers."

23. D.FF. 28 correctly reflects Binstein's testimony to the effect that:

"Chalet" stores operated by plaintiffs' Cheese Chalet I, Ltd., Cheese Chalet III, Ltd., Cheese Chalet IV, Ltd., and Chalet Wine & Cheese Shop, Ltd. and Chalet International, Ltd. [operated in part as a Chalet store (Tr. 60)] are operated according to a different marketing concept than the stores of the other plaintiffs—a concept designed to attract the affluent, people who have traveled, young professionals and people who want to buy things they can't find in the average stores (Tr. 67).... "Chalet" stores do a unique job of marketing hundreds of different cheeses from many different countries and offer personal attention from sales people not available at stores operated by the other plaintiffs (Tr. 67, 68).

No weight has been given however to those facts or to the assertions in D.FF. 29 that:

The sale of spirits by Chalet stores constitutes a very small percentage of their sales which are principally of wine and cheese; indeed, certain Chalet stores do not carry some of the Seagram products involved in this litigation (Tr. 947, 949–50, 952–53, 959, 963–64, D.Ex. 113(c)). Moreover, Chalet store managers testified that their store's sales would not suffer if the sale of Seagram products dropped (Tr. 952, 953, 960).

Those store managers have served as such only since the prices of Seagram Products became too high to permit their use as "door openers" (see Finding 19). Were that still possible it is entirely reasonable to infer, and this Court does infer, that *increased* sales of Seagram Products (which would be the natural competitive result of substantially lower prices) would also increase sales of Chalets' other products with much higher markups (Tr. 72–73, 98). Indeed it is common knowledge (and a proper subject for judicial notice) that operations such as Chalet stores seek to stimulate impulse buying of high markup items by various marketing techniques, so that the importance of the low-priced "door opener" product is wholly consistent with Binstein's testimony.

24. Binstein's Supp.Aff. ¶ 9 (emphasis in original) stated that the 1979 alleged fixing of the prices for Seagram products resulted in plaintiffs' stores "being unable to offer Seagram brands for sale, *at cost* * * *." D.FF. 31 stated:

Nothing alleged by the plaintiffs to have been done by the defendants would render plaintiffs' stores unable to sell Seagram brands at plaintiffs' cost and thus render it unable to use the Seagram products as "door openers" and, as a result, increase traffic flow and store profits. Further, plaintiffs offered no proof that any other retailer received better prices on these products and thus could undercut plaintiffs on these items.

Again defendants are entirely disingenuous. For Seagram Products to serve as effective "door openers," their comparative prices vis-a-vis other competitive products are obviously at least as significant as the prices charged to Gold Standard for Seagram Products in comparison with the prices charged to Gold Standard's competitors. Were Gold Standard able to prove the alleged price-fixing conspiracy involving Seagram Products, its continuing ability to sell those products at cost (a higher cost resulting from price fixing) would be totally irrelevant. Gold Standard would still have been damaged by the conspiracy. Nor is the absence of differentials in the prices charged for Seagram Products sold to Gold Standard and to other retailers (if true) probative. Gold Standard was willing to sell Seagram Products *at* or *below* cost (a decision other retailers might not be prepared to make, even though their costs were identical) only so long as that cost was favorable in comparison with other competing *brands* —the differential claimed to have been destroyed by the alleged conspiracy and its higher pricing.

*Seagram's Marketing Strategies*

25. For some 40 years Seagram has consistently pursued the "Seagram philosophy" (Tr. 462) of advocating what it views as a "fair profit" for itself, a "fair profit" for the distributor and a "fair profit" for the retailer (Tr. 1007–08). Toward that end it actively encourages its distributors to adhere to its suggested prices, including suggested discounts. Retail price is an important factor in Seagram's philosophy (Tr. 437).

26. Because of its sensitivity to antitrust implications Seagram distributes to its sales and marketing personnel a carefully prepared Antitrust Compliance Booklet (Tr. 563–64; Seagram Ex. 1). On the subject of resale prices that Booklet states:

While it is an acceptable practice to suggest resale prices for our products, it is not lawful to enter into an agreement with our customers that they will sell our products at the prices we suggest, including suggested discounts. Such activity is a form of price-fixing called "resale price maintenance," and it is *per se* unlawful. Thus, supplier agreements with purchasers, express or implied, written or oral, coerced or voluntary, establishing resale prices, whether minimum or

maximum, are never permissible under any circumstances. The fact that a distributor may enthusiastically agree is irrelevant, *any* agreement on resale prices is unlawful.

Example: A Company salesperson explains to a distributor that resale prices to retailers cannot drop below a specified amount because the Company wants to maintain the spread on its products as the most expensive brand. The salesperson further states that if prices are not kept above the set figure, the Company will find another distributor to handle its products. Is this conduct permissible?

No. Such conduct represents an attempt to coerce an agreement to charge minimum resale prices and is, hence, per se unlawful, whether the distributor goes along with the salesperson's demands, or loses his distributorship because he refuses to go along.

It is important to recognize that there is a very fine line between (1) a suggestion which is followed simply as a result of the customer's own decision; and (2) an agreement to charge a suggested price. You should not make suggestions without first clearing their content and the methods you use with Company counsel.

Example: A salesperson provides a distributor with a list of the Company's suggested resale prices. He explains to the distributor that all other distributors in the area adhere to this list, and that it would be in his "best interests" to comply as well because, if he doesn't, the Company will "reconsider whether it should continue selling to him." Is that a proper suggestion?

No. The salesperson's conduct goes beyond mere suggestion because it implies a threat to discontinue sales to the distributor if he does not resell at the Company's prices. Such behavior constitutes unlawful coercion.

Example: A salesperson encourages distributor promotion programs with discounts to the distributor. Is that appropriate?

It depends on the salesperson's conduct. He may not police the distributor to insure that the discounts are passed through to the retailers. Moreover, the granting of discounts cannot be conditioned upon an agreement or understanding that the customer will pass through all or any part of the discount. It is not enough that the distributor is free to disregard the Company's price suggestion when it is made. In addition, he should be free, after the Company representative has left him, to determine his own prices. If he has not agreed to charge certain prices, and thus is still free to make up his own mind, then there is no unlawful price maintenance even if his independent determination approximates the Company's suggested price. While advice and suggestions to distributors are permitted, it is important that they do not reach a level of coercive conduct or agreement. Our customers must be afforded complete pricing freedom, and you should tell them they have this freedom.

*Federated's and Capitol's Pricing to Gold Standard Through Early 1979*

27. Prices to retailers like Gold Standard in the liquor industry, as in many industries, are a function of the discounts given from specified "list prices," with the retailer paying the resulting net figure (Tr. 190). Before Galletta came to this area as Distiller's Central Division Manager January 1, 1979 (Tr. 424) Federated and Capitol had always followed Seagram's *list* prices to the retailer (Tr. 1064, P.G.Ex. 12). That however was a meaningless identity, because their *discounts* were established independently and were usually different, not in accordance with Seagram's suggestions (Tr. 434–37, 464–65, 797–98).

28. Before Galletta's arrival on the scene he had been briefed by the previous division manager on the "chaotic market conditions" in the Chicago area (Tr. 429). From Seagram's point of view its brands were being "footballed" by the retailer (Tr. 427), and Galletta was displeased at the retail prices (which he viewed as too low) for which the Seagram Products were being advertised (Tr. 460–65). Galletta concluded that the "chaotic" market conditions

and retailers' "footballing" of prices were the result of the distributors' failure to follow Seagram's suggested discounts and net prices (Tr. 427).

29. During January through March 1979 Galletta continuously urged each of Federated and Capitol to adopt and adhere to Seagram's suggested discounts—until he was "blue in the face" (Tr. 434, 438–39, 497, 499). Each of Federated (through Klein) and Capitol (through Friedman) assumed (logically enough) that Seagram (through Galletta and Seagram's state manager) was simultaneously urging the other to do so (Tr. 809–11, 1037, 1039, 1054, 1139).

30. This Court does not view the evidence as supporting a finding that Seagram's urging upon each of Federated and Capitol that they adopt and adhere to Seagram's suggested list prices, either in early 1979 or at any other time, implicated either an express or implied threat of cancellation or nonrenewal of the distributors' franchises or other retaliation if they did not do so (Tr. 451–52, 477–78, 562–63, 633, 635, 798–800, 999–1000). Both Federated and Capitol are highly valuable distributors with large organizations, and Galletta's continuing efforts at persuasion rather than threats confirm the importance of both distributors to Seagram.

*Federated's and Capitol's Knowledge of Each Other's Prices*

31. From at least January 1, 1979 to the time of the Hearing Federated has held a sales staff meeting by the second week of the month for its Old Rose and South Shore divisions, at which Klein would announce the prices to retailers for the following month. Such prices would then be immediately communicated by the Federated sales organization to retailers such as Gold Standard (Tr. 1137, 1140, 1143).

32. At Capitol the decision as to discounts to retailers for the following month is made by Friedman. Friedman keeps his decision to himself until the third week of the month, when a notice is put out to the trade of prices for the next month (Tr. 1054–55, 1076).

33. Klein receives market information about competitive pricing of major brands such as V.O. and Seven Crown within hours, primarily whenever such pricing is lower than Federated's pricing (Tr. 802, 1140–41). Klein receives his information from Federated salesmen who get it from retailers (Tr. 770–72). Friedman similarly hears about any lower Federated prices to retailers within an hour of their promulgation. That information comes to him from Capitol salesmen who receive it from retailers (Tr. 1039–41).

34. Though Friedman's testimony was limited to his knowledge as to Federation's adoption of *lower* prices, in light of the description of the nature of the industry during the Hearing the Court infers and finds that Capitol is necessarily regularly aware of Federated's adoption or non-adoption of the Seagram recommended discounts promptly after such decisions are announced to the trade, and before Capitol reaches its own decisions in that respect. For the same reason the Court finds that Klein regularly acquires almost instantaneous knowledge of any prices Capitol announces to the trade.

*Federated's and Capitol's May 1, 1979 Price Increases (Seagram's V.O., 7 Crown, Gin and Crown Royal)*

1. *Activity at Federated*

35. Klein became Federated's Executive Vice-President in charge of marketing and sales in October 1978 (Tr. 582). For many years before that he had been with Seagram's General Wine division, the year immediately before joining Federated having been in charge of that division's promotion in the Midwest (Tr. 579–82). Federated hired Klein to reorganize its sales operation and to eliminate several major problems it viewed as plaguing those operations (Tr. 585).

36. Upon arriving at Federated Klein discovered the company's own divisions, South Shore and Old Rose, undercutting each other on discounts to the retailer. In the same connection he found that Federated's failure to place all discounts on the face of the invoice made it difficult for Federated to deal with retailers' claims

that they had received oral discounts from salesmen or Federated executives (Tr. 585–88, 689–90). Accordingly Klein decided to install a system requiring that all discounts be reflected on the invoices to retailers (Tr. 611–12; see D.Ex. 24–27, 32, 36, 47 and 53). In addition, Klein hired new division presidents and vice presidents for South Shore and Old Rose (Tr. 587–88). Though all such efforts were of course important to Federated's business, they are irrelevant to the issues in this action.

37. What is relevant to this action is that Klein, as a long-time Seagram executive familiar with its philosophy, was obviously inclined to be receptive to the idea of following suggested prices. When Galletta broached that subject in January and February 1979, Klein said he would like to do so but was not prepared to do so if it meant Federated's loss of business to Capitol (Tr. 432, 468, 637).

38. After further consideration, Klein then decided that in an effort to increase Federated's profits he would systematically seek to reduce discounts—thereby raising prices (Tr. 590, 592–93, 599–600). Klein initially did so on some non-Seagram brands and then decided in March 1979 to do so on the four Seagram brands handled by Galletta's Distillers division effective May 1, 1979. Klein told both Binstein (Tr. 618, 625) and Galletta of his decision to adopt Seagram's suggested discounts as of that date (Tr. 630, 639), and Federated alerted the trade generally to the decision between March 15 and April 1, 1979 (Tr. 1145).

39. Klein's decision for Federated to increase prices by decreasing discounts was a business decision, not one motivated by economic threats. Seagram's suggested prices were not however established based on any knowledge of Federated's (or for that matter Capitol's) economic circumstances—either their operating or other costs or their profit-loss situations. Accordingly this Court does not credit any testimony by Klein that the Federated decision to follow the Seagram suggestions—either in May 1979 or at any later time—was based on a determination that those suggested prices were the optimum prices for Federated in an economic model. As with any unilateral pricing decision of a supplier, Klein's decision was rather made with the knowledge that if the competition (in this case Capitol) chose to follow Federated's prices up, Federated would likely retain its market share and increase its profits. Klein believed that Capitol would go to the identical discounts (Tr. 812). If Capitol chose otherwise, Klein would have to re-evaluate the situation based on what impact the price differential had on Federated's market share and profits. Klein's decisions were also necessarily made in the realization that the Seagram Products are only a submarket in the relevant market of alcoholic beverages, so that the pricing of Seagram Products of course affects their (and Federated's) share of the total market because of elasticity of demand.

### 2. Activity at Capitol

40. Friedman testified he made an economic judgment in April 1979 that Capitol would follow the Seagram suggestions as to the discounts on the four Distillers division Seagram brands as of May 1, 1979 because of increased costs due to a new drivers union contract and overhead costs (Tr. 548, 1012, 1015). At the same time Friedman also lowered Capitol's discounts—raised prices—on non-Seagram brands (Tr. 1015–16).

41. This Court does not credit Friedman's testimony referred to in Finding 40. It finds that Capitol's adoption of the Seagram suggested prices was also a business decision, not one motivated by economic threats. Again however the prices were not the result of a determination that they were optimum prices in an economic model, but rather a decision to raise Capitol's prices to the same level as the higher prices previously adopted by Federated. As such the decision represented the other side of the same coin described in Finding 39.

*Federated's and Capitol's August 1, 1980 Price Increases (Myers's Rum)*

42. Myers's Rum is also handled by Seagram's Distillers division. In February

1980 Lawrence Schwartz ("Schwartz") came to Chicago as the "Metro Manager" for that division, working under Galletta (Tr. 554, 556). Sometime thereafter Schwartz told Klein of a proposed new product line on Myers's Rum—a new Puerto Rican White and a new Puerto Rican Gold Rum—to begin distribution September 1, 1980. Schwartz said the discounts being given in the market were not conducive to the image of the new brand, so that Seagram was suggesting a new resale price (Tr. 571). Klein said he "would look at it" (Tr. 572).

43. Klein analyzed the Seagram suggested discount structure for Myers's Rum in July 1980 and decided that Federated could afford to give large retailers such as Gold Standard a $2 per case discount more than that suggested by Seagram. Federated did so as of August 1, 1980 (Tr. 770–71) and so notified the trade in mid-July (Tr. 802–03).

44. Capitol notified the trade of its adoption of identical discounts in the third week of July (Tr. 1054–55). Again Capitol was paralleling Federated's price structure.

*Federated's and Capitol's January 1, 1981 Price Increases (Chivas Regal, Chivas Royal Salute and Lochan Ora)*

45. In November 1980 Klein decided Federated would follow Seagram's suggestions as to the Scotches distributed by General Wine as of January 1, 1981. Klein so informed General Wine and published Federated's new prices to the trade in mid-December pursuant to Federated's usual practice (Tr. 772–73, 797).

46. Capitol again followed Federated and published its new prices for the same three products to the trade in the third week of December 1980 (Tr. 1054–55, 1976).

*Federated's and Capitol's Pricing After Identical Prices Were First Announced*

47. There is no evidence of any discussions between Federated and Capitol about prices (Tr. 642–43, 772–73). Nonetheless, once identical prices were first announced as to any Seagram Product (in all instances except Myers's Rum, conforming to Seagram's suggested prices; as to Myers's Rum, a specific amount less than Sea-

gram's suggestion), Federated and Capitol have always charged identical prices for that product (Ct.Ex. 1; Tr. 434–39, 446, 449, 493, 497, 502–03, 529; Tr. 133–40, 517, 525; Tr. 150–57) except as described in Finding 48(c) and (d). Those identical prices followed Seagram's suggestions both *up* and *down*, without reference to changes in Federated's or Capitol's costs or other pricing factors. Klein's and Friedman's testimony that their respective decisions were based on their economic judgments of factors such as increasing costs, market facts and competitive risks (Klein: Tr. 632–33, 642–43, 690–91, 716, 718, 772–73, 797, 802–03, 829–31, 908–09, 913–14, 939–41; Friedman: Tr. 548–49, 1013–16, 1034–35, 1058) is not credible in light of the nature of the price movements. In each instance Findings 39 and 41 apply to the distributors' pricing decisions.

48. In several instances (in addition to the Myers's Rum situation) the identical pricing by the distributors did not adhere to Seagram's suggested prices:

(a) In mid-August 1979 Klein decided to raise Federated's "front line" prices for spirits $1 per case effective September 1979 (see D.Exs. 34–35). Capitol (as of October 1, 1979) and other distributors followed that price increase, which was not pursuant to Seagram's suggestion (Tr. 708–09, 716–18, 800–01, 1015).

(b) Federated again raised its "front line" prices for spirits $1 per case in January 1981 (Tr. 753; see D.Exs. 51–52). At Binstein's request that price increase did not become effective as to Gold Standard until February (Tr. 753–54). Capitol increased *its* front line prices by the same $1 per case in February (Tr. 1066–67). Again the price increase was not pursuant to Seagram's suggestion (Tr. 800–01, 1067).

(c) In January 1981 Klein offered Gold Standard an additional discount of $2 a case on all purchases from Federated, including Seagram products, if Gold Standard purchased 50,000 or more cases from Federated during 1981. If earned that discount would be reflected by the issuance of monthly credit memos in

1982. Such proposed additional discount was not pursuant to Seagram's suggestion (Tr. 759, 763).

(d) In January 1981 Friedman offered and Gold Standard accepted an additional 1% discount on all purchases from Capitol, including Seagram Products. That proposed discount was not pursuant to Seagram's suggestion (Tr. 996, 1000, 1002).

Those facts tend further to confirm that Federated's and Capitol's parallel pricing was not responsive to coercion or threats by Seagram.

*Irreparability of Harm to Gold Standard*

49. Binstein's testimony that his refusal to renew the Gold Standard Liquors, Inc. lease at 3012 North Broadway, Chicago because of defendants' pricing practices is not credible. It was contradicted by the testimony of the landlord's representative as to the timing of, and Binstein's statement of reasons for, the decision not to renew (Tr. 779–84; D.Ex. 56).

50. Binstein's testimony that Gold Standard's postponement of store expansion plans was also attributable to defendants' pricing practices is also not credited. It was not fully consistent with the testimony of Binstein's real estate lawyer as to those prospective transactions (Tr. 1092–1102).

51. If defendants had engaged in a price-fixing conspiracy of the nature charged in Gold Standard's Complaint, the damages to Gold Standard might be real and substantial and difficult to measure with precision, thus satisfying the requirement of inadequacy of Gold Standard's remedy at law. Gold Standard's delay in bringing this action, however, is not justified by Binstein's argument that he engaged in unsuccessful efforts at "self-help" over a two-year period, only realizing when the Federated-Capitol parallel pricing extended to the three Scotch brands that he had failed in those efforts. If Gold Standard's claim is taken at face value, the principal harm occurred when the most important Seagram Products became the subject of identical pricing early in 1979. Gold Standard's two-year delay in bringing this action after that occurred precludes the granting of preliminary injunctive relief.

*Conclusions of Law*

1. Any Finding that may be deemed a matter of law is hereby restated as part of these Conclusions. Any conclusion that may be deemed a matter of fact is hereby restated as part of the foregoing Findings.

2. This Court has jurisdiction of the parties and of the subject matter of this proceeding under Sherman Act § 1 (15 U.S.C. § 1), Clayton Act §§ 4 and 16 (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

3. There are four questions that must be answered "yes" before a plaintiff is entitled to preliminary injunctive relief, the first of which serves as a threshold requirement, *O'Connor v. Board of Education*, 645 F.2d 578, 580 (7th Cir.1981):

(1) whether the plaintiff has at least a reasonable likelihood of success on the merits;

(2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(3) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and

(4) whether the granting of a preliminary injunction will disserve the public interest.[1]

See also 15 U.S.C. § 26 as to injunctive relief in antitrust cases, incorporating equitable principles generally and identifying the second of the above considerations specifically. Because Gold Standard has failed not only on the threshold requirement (which under *O'Connor* obviates the need to go further in denying preliminary injunctive relief) but also the second requirement identified in the statute, the last two factors need not be discussed.

---

1. As recently as December 8, 1981 our Court of Appeals has again reconfirmed these principles in *Machlett Laboratories, Inc. v. Techny Industries, Inc.*, 665 F.2d 795, 796–97.

4. "Something more" than Seagram's suggestions of resale prices, coupled with persuasion or urging their adoption, must be shown to impose antitrust liability on Seagram. *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 707 (7th Cir. 1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1140–41 (9th Cir.1974); *Susser v. Carvel Corp.*, 332 F.2d 505, 510 (2d Cir.1964), *cert. dismissed*, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). Gold Standard has shown nothing "more" on Seagram's part than its continuing to suggest resale prices to Federated and Capitol after it knew that they had adopted and were continuing to follow those suggestions. Seagram was thus a catalyst facilitating "conscious parallelism" by Federated and Capitol without their *agreeing* to charge identical prices. To date that has not been recognized as a ground for imposing liability for vertical price-fixing under the antitrust laws.

5. "Something more" than conscious parallelism in competitors' pricing—what are often termed one or more "plus factors"—must be shown to impose antitrust liability on Federated and Capitol. *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457, 462–63 (7th Cir.1981); *Admiral Theatre Corp. v. Douglas Theatre Corp.*, 585 F.2d 877, 884 (8th Cir.1978). Because Federated's and Capitol's conduct was no different from what competitors might engage in under normal competitive conditions (see Finding 39), Gold Standard has not met that burden. As reconfirmed in *Weit*, 641 F.2d at 463, absent direct evidence of a price-fixing agreement, "the inference of unlawful agreement rather than individual judgment must be the compelling, if not exclusive, rational inference."

6. For the reasons stated in Conclusions 4 and 5, Gold Standard has not sustained its burden of demonstrating a reasonable likelihood of success on the merits.

7. Gold Standard has not brought itself within the scope of *Continental Distributing Co. v. Somerset Importers, Ltd.*, 411 F.Supp. 754 (N.D.Ill.1976) in terms of its claimed irreparable injury. It has not sustained its burden of demonstrating such irreparability (see Findings 49–51), a conclusion supported by its two-year delay in seeking a preliminary injunction. *Allston v. Lewis*, 480 F.Supp. 328, 333 (D.S.C.1979); *Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*, 335 F.Supp. 278, 280 (S.D.N.Y.1971); *Klauber Bros. Inc. v. Lady Marlene Brassiere Corp.*, 285 F.Supp. 806, 808 (S.D.N.Y.1968). Explanation of that delay was the first question posed by this Court when Gold Standard first moved for preliminary injunctive relief. Given the Court's findings that Gold Standard has not proved its claims as to business closing and the stifling of expansion, Gold Standard has not answered that question in a way that calls for such relief.

8. In a sense it might be asked how defendants would be harmed by issuance of a preliminary injunction that after all would only restrain conduct already illegal: violations of the law prohibiting price fixing conspiracies. But given the legal principle that conscious parallelism alone is not actionable because it may be indistinguishable from perfect competition, such an argument would be simplistic and wrong. Any such broadly stated injunction would inflict harm on defendants by exposing them to the prospect of having to defend themselves in contempt proceedings each time Federated and Capitol issue their monthly price sheets pending a trial on the merits.

9. For failure to meet the burden imposed on it by law, Gold Standard's motion for issuance of a preliminary injunction under Rule 65(a) is denied.

Date: December 14, 1981

## APPENDIX 2

### FIRST SET OF STIPULATIONS

It is hereby stipulated by and between the plaintiffs and the defendants through their respective counsel as follows:

1. So far as is relevant to the case at bar, Seagram does business in states having three different types of alcoholic bever-

age regulations: (1) affirmation states; (2) control or monopoly states (suppliers sell directly to state agency which resells to consumer); and (3) non-affirmation and non-control states. In affirmation and control states, Seagram is required by law to sell its goods to distributors or state agencies, as the case may be, at the lowest F.O.B. price that it charges to any distributor in the United States ("Affirmation Price"). In non-affirmation and non-control states, Seagram need not sell its goods at the lowest F.O.B. price but may price its goods to distributors as it sees fit. Illinois is a non-affirmation, non-control state.

2. "Overpricing" is a term used in non-affirmation, non-control states in those instances where Seagram's F.O.B. selling price to the distributor is greater than the affirmation price for the same brand and size. The extent of the difference is defined as "overpricing" (*e.g.*, Metro Chicago price—$52.00 per case; affirmation price—$50.00; Seagram "overpricing"—$2.00 per case).

3. A "Credit Memo" in the amount of overpricing per case multiplied by the number of cases of a particular product purchased by the distributor is issued to the distributor by Seagram.

4. The concept of the Bank is believed to have been conceived by Seagram, although Seagram has been unable to ascertain any specific information on the subject.

5. A "Depletion Allowance" (also known as "Participation to Wholesaler") is the amount of money that the distributor allocates against the Bank to support retail trade discounts with respect to a particular Seagram product.

6. Seagram engages in overpricing in Illinois and various other non-affirmation states. This procedure is also practiced by 16 other suppliers that distribute to Federated and/or Capitol in Metropolitan Chicago.

7. From time to time, the Seagram national office will offer "Special Promotional Allowances" ("SPA's") to its distributors on a national basis. For example, Seagram Distillers may offer its distributors an SPA of $1.00 per case in a particular month. As in the case of overpricing, a credit memo is issued to the distributor by Seagram in the amount of the SPA per case multiplied by the number of cases purchased.

8. The method by which overpricing and SPA credit memos are issued to the distributors is as follows: at some time, following the month of shipment, the Seagram Des Plaines office forwards a request for a credit memo to the Seagram New York office. The amount of the credit memo is determined by the number of cases sold to a particular distributor, multiplied by the amount of overpricing and/or SPA applicable to each brand and size. After the credit memo request is received in New York, the New York office reviews the amount of the credit requested by the Division office in Chicago with respect to that particular distributor. The shipments to the distributor for the period requested as well as the amount of the applicable overpricing and/or SPA allowance are checked. When the amount of the request is verified, the credit memo is signed by a national office management employee and forwarded to the Accounts Payable Department in New York which issues the credit memos and sends them to the distributor.

9. In most instances, credit memos are issued by Seagram more than 30 days after the products which generated their issuance have been delivered to the distributors.

10. In most instances, the distributors resell Seagram products within 30 days of receiving such products into inventory.

11. After receiving a credit memo Federated or Capitol enters it upon its books and applies it as follows: *

---

* The accounting systems of the distributors are in accord with general principles of accounting procedure, namely: (1) Asset Accounts are increased by Debits and decreased by Credits; conversely, Liability Accounts are increased by Credits and decreased by Debits; (2) Income Accounts are increased by Credits and decreased by Debits; conversely, Expense Accounts are increased by Debits and decreased by Credits; (3) Debits are entered on the left-hand

(a) Each distributor maintains an account known either as the Seagram Bank or Promotional Account (hereinafter called the "Bank"). This account represents amounts available for the promotion of Seagram products. The distributor also maintains a trade Accounts Payable account. This account represents amounts owed to suppliers for goods purchased by the distributor. Both the Bank and the Accounts Payable accounts are increased by credit entries and decreased by debit entries.

(b) Upon receipt of a credit memo the distributor makes two offsetting entries on its books—

(i) A credit entry is made in its Bank, which entry increases that account (rather than a credit entry in the Cost of Sales account, which entry would have decreased that account); and

(ii) A debit entry is made in Accounts Payable which entry decreases that account.

Accordingly, a credit memo that is issued in respect to a particular purchase is applied to reduce the amounts due on future purchases made by the distributor from Seagram (debit to Accounts Payable); and to increase the amount of the Bank (credit to Bank).

(c) The amount of the Bank is reduced (debited) when any of the following events occur:

(i) When the distributor uses cash funds (or incurs a liability) as a result of promoting a Seagram product, the distributor's Cash Account is credited and decreased (or liability to pay the cost of the promotion is credited and increased). For the offsetting entry, its Bank is debited and decreased in equal amount (unless the distributor alternatively charges the promotion against its general profits by debiting and increasing its Cost of Sales account);

(ii) Following the end of each month, the distributor debits and decreases its Bank in an amount equal to the number of cases of a particular product sold to retailers during the month, multiplied by the amount of the Depletion Allowance per case for the particular product. For the offsetting entry, the Cost of Sales account is credited and decreased in an equal amount; and

(iii) Following the end of each month in which a special promotion (such as the "Family Plan") is offered by the distributor to retailers, the distributor debits and decreases its Bank. For the offsetting entry, the Cost of Sales account is credited and decreased in an equal amount.

(d) Capitol sends monthly statements to Seagram reflecting all charges against (debits to) the Bank.

12. Seagram frequently makes various promotional materials available to the distributors free of charge. These free materials are intended to complement national promotional programs by Seagram, as for example, advertising in national magazines such as Sports Illustrated.

13. When a monthly national program is implemented by Seagram, the Seagram office for the Central Division receives an allocation of the various promotional materials from Seagram's national office. The Central Division then allocates these promotional materials among its distributors.

side of an account; conversely, Credits are entered on the right-hand side of an account; and (4) Every Debit or Credit Entry into one account must be balanced, respectively, by an equal Credit or Debit entry into another account.